## UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

| | |
|---|---|
| UNITED STATES, THE STATES OF CALIFORNIA, DELAWARE, FLORIDA, ILLINOIS, INDIANA, NEVADA, NEW MEXICO, NEW YORK, and TENNESSEE, THE COMMONWEALTHS OF MASSACHUSETTS AND VIRGINIA, and THE DISTRICT OF COLUMBIA ex rel. JOHN HENDRIX,<br><br>Plaintiffs,<br><br>v.<br><br>J-M MANUFACTURING COMPANY, INC., d/b/a JM Eagle, a Delaware corporation, and FORMOSA PLASTICS CORPORATION, U.S.A., a Delaware Corporation,<br><br>Defendants. | Civil Action No. _____<br><br>Pending in the United States District Court for the Central District of California<br><br>Honorable George H. Wu, U.S.D.J.<br><br>CA Case No.: ED CV06-00055-GW |

**DECLARATION OF STUART M. RENNERT IN SUPPORT OF PLAINTIFFS'
MOTION TO QUASH THE SUBPOENA ISSUED BY DEFENDANT, J-M
MANUFACTURING COMPANY, INC. TO NON-PARTY,
MICROBAC LABORATORIES, INC.**

STUART M. RENNERT, of full age, hereby declares as follows:

1.  I am an attorney-at-law of the District of Columbia and am admitted to the practice before the United States District Court for the District of Colorado. I am co-counsel to *Qui tam* Plaintiff, John Hendrix in this action ("Plaintiff"). As such, I am fully familiar with the facts set forth herein.

83559300.1

2. I submit this Declaration in support of the Motion to Quash the Subpoena Duces Tecum ("Subpoena") issued by Defendant, J-M Manufacturing Company, Inc. ("Defendant") to Non-party, Microbac Laboratories, Inc. ("Microbac").

3. A true copy of the Fourth Amended Complaint (without exhibits) is attached hereto as Exhibit A.

4. A true copy of the Subpoena issued by Defendant to Microbac on May 13, 2011 is attached hereto as Exhibit B.

5. On or about May 31, 2011, a partner in my firm conferred with counsel for Microbac to notify him that the Relator objected to the production of documents in response to Defendants' Subpoena.

I hereby declare, under penalties of perjury, that the foregoing statements made by me are truthful and accurate to the best of my knowledge. EXECUTED this 28th day of June, 2011.

_____
STUART M. RENNERT

# EXHIBIT A
## Declaration of Stuart Rennert
# (Part 1)

COPY

1   ERIC R. HAVIAN (State Bar No. 102295)
    erh@pcsf.com
2   MARY A. INMAN (State Bar No. 176059)
    mai@pcsf.com
3   HARRY P. LITMAN (State Bar No. 127202)
    hlitman@litman-law.com
4   JESSICA T. MOORE (State Bar No. 183431)
    jtm@pcsf.com
5   PHILLIPS & COHEN LLP
    131 Steuart Street, Suite 501
6   San Francisco, California  94105
    Tel: (415) 836-9000
7   Fax: (415) 836-9001

8   BRENT N. RUSHFORTH (State Bar No. 45873)
    brushforth@daypitney.com
9   DAY PITNEY LLP
    1100 New York Ave., NW
10  Washington, D.C. 20005
    Tel: (202) 218-3900
11  Fax: (202) 218-3910

12  Attorneys for Qui Tam Plaintiff John Hendrix

13              UNITED STATES DISTRICT COURT

14          FOR THE CENTRAL DISTRICT OF CALIFORNIA

| 15 UNITED STATES, THE STATES OF 16 CALIFORNIA, DELAWARE, 17 FLORIDA, ILLINOIS, INDIANA, 18 NEVADA, NEW MEXICO, NEW YORK, and TENNESSEE, THE COMMONWEALTHS OF 19 MASSACHUSETTS AND VIRGINIA, 20 and THE DISTRICT OF COLUMBIA ex rel. JOHN HENDRIX, 21 22     Plaintiffs, vs. 23 J-M MANUFACTURING 24 COMPANY, INC., d/b/a JM Eagle, a Delaware corporation, and FORMOSA 25 PLASTICS CORPORATION, U.S.A., 26 a Delaware corporation, 27     Defendants. | Case No.: ED CV06-00055-GW  FOURTH AMENDED COMPLAINT FOR VIOLATION OF FEDERAL AND STATE FALSE CLAIMS ACTS  JURY TRIAL DEMANDED  **REDACTED VERSION** |
|---|---|

28

CLERK U.S. DISTRICT COURT
CENTRAL DIST OF CALIF
LOS ANGELES
2011 MAY 24  AM 11: 25
FILED

Case 1:11-cv-01691-MSK-MJW   Document 1-1   Filed 06/28/11   USDC Colorado   Page 5 of 50
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 2 of 140   Page ID
#:14392

# I. INTRODUCTION

1. This action is based on a massive fraud Defendants J-M Manufacturing Company, Inc. ("J-M"), currently doing business as JM Eagle™, and Formosa Plastics Corporation, U.S.A. ("FPC") perpetrated for well over a decade on the federal, state, and local governments to whom they sold polyvinyl chloride ("PVC") pipe. This fraud, described in detail herein, constitutes a violation of the federal False Claims Act ("FCA") and the various False Claims Acts of the states included in this Third Amended Complaint (the "Complaint"). This fraud has caused federal, state, and local governments to purchase and install PVC pipe that has only a fraction of the strength and endurance Defendants represented it to have. This, in turn, has caused failures of the PVC pipe in the field and has resulted in PVC pipe in the ground that will need to be replaced in a fraction of the time that Defendants represented it would last, and that the federal, state, and local governments, relying on those representations, expected it to last. Defendants perpetrated this fraud through the following actions, among others:

a) using poor quality materials in the recipe of the PVC pipe, substituting those cheaper materials for better materials that were used previously;

b) running the manufacturing process, called extrusion, at speeds that damaged the quality of the PVC pipe while failing to properly maintain the manufacturing equipment;

c) cherry-picking, rather than randomly selecting, PVC pipe for testing, thus ensuring that the test provided no result representative of the quality and strength of the PVC pipe sold to the federal, state, and local governments;

d) consistently misrepresenting the quality and strength of the PVC pipe on the pipe itself, as well as in corporate and sales literature;

e) presenting and causing their distributors to present false claims to the federal, state, and local governments herein.

FOURTH AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

Case 1:11-cv-01691-MSK-MJW   Document 1-1   Filed 06/28/11   USDC Colorado   Page 6 of 50
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 3 of 140   Page ID
#:14393

2.      This action seeks to recover damages and civil penalties on behalf of the United States, the States of California, Delaware, Florida, Illinois, Indiana, Nevada, New Mexico, New York, and Tennessee, the Commonwealths of Massachusetts and Virginia, the District of Columbia, and numerous political subdivisions and public water and sewer agencies located within these States/Commonwealths/District (collectively the "real parties in interest" or "Real Parties") arising from false statements and claims made, and caused to be made, by Defendants J-M and FPC in violation of the federal FCA, 31 U.S.C. §§ 3729 *et seq.*, and the following State False Claims Acts:  California False Claims Act, Cal. Gov't Code §§ 12650 *et seq.*, Delaware False Claims And Reporting Act, 6 Del. C. §§ 1201 *et seq.*, District of Columbia False Claims Act, D.C. Code §§ 2-308.13 *et seq.*, Florida False Claims Act, Fla. Stat. Ann. §§ 68.081 *et seq.*, Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. Ann. §§ 175/1 *et seq.*, Indiana False Claims and Whistleblower Protection Act, Ind. Code Ann. §§ 5-11-5.5-1 *et seq.*, Massachusetts False Claims Law, Mass. Gen. Laws Ch. 12 §§ 5A *et seq.*, Nevada False Claims Act, Nev. Rev. Stat. Ann. §§ 357.010 *et seq.*, New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. §§ 44-9-1 *et seq.*, New York False Claims Act, N.Y. State Fin. §§ 187 *et seq.*, Tennessee False Claims Act, Tenn. Code Ann. §§ 4-18-101 *et seq.*, and Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1 *et seq.* (collectively the "State FCAs").

3.      The Real Parties defrauded by Defendants J-M and FPC include, without limitation, the United States, the States of California, Delaware, Florida, Illinois, Indiana, Nevada, New Mexico, New York, and Tennessee, the Commonwealths of Massachusetts and Virginia, the District of Columbia, the political subdivisions and public water and sewer agencies set forth in Exhibit 1 (incorporated herein), and all other political subdivisions and public water and sewer agencies within the States of California, Delaware, Illinois, Indiana, Nevada, New Mexico, New York, and Tennessee, the Commonwealths of Massachusetts and

FOURTH AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

Case 1:11-cv-01691-MSK-MJW   Document 1-1   Filed 06/28/11   USDC Colorado   Page 7 of 50
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 4 of 140   Page ID
#:14394

1   Virginia, and the District of Columbia that purchased J-M's PVC pipe between

2   January 18, 1996 and the present, <u>except in the case of the Real Parties in New</u>

3   <u>Mexico and New York, the purchases must have occurred between January 1, 2007</u>

4   <u>and the present.</u>[1]

5       4.    For the past 30 years, J-M has been in the business of manufacturing

6   and selling PVC pipe for the transmission and distribution of water (potable and

7   reclaimed) and for use in sewer systems.  For 23 of those years, FPC was the sole

8   owner of J-M and FPC employees and officers were involved in key aspects of J-

9   M's business.  Federal military bases, State Roads and Highway Projects, cities,

10   public water distribution, and sewer collection agencies are the primary purchasers

11   of J-M's PVC pipe.  J-M sells to these entities by enlisting distributors to act as

12   middlemen between J-M and its customers.  J-M's PVC pipe products are designed

13   almost exclusively for use in water or sewer transport systems so that even parts

14   sold to distributors are eventually installed in such systems.

15       5.    Defendants understand and intend that J-M PVC pipe will be sold to

16   government entities, including Real Parties, and know that government entities are

17   the biggest customers for J-M pipe.  For example, J-M markets its products

18   specifically to government entities and reaches out to municipalities, water districts,

19   and water authorities, including Real Parties, for the purpose of selling its products

20   and for the purpose of convincing those government entities to permit J-M pipe to

21   be installed in the water and sewer systems of the government entity.

22       6.    Defendants understand and intend that J-M pipe will be owned and

23   maintained by government entities, including Real Parties, regardless of who installs

24   it for the government entities.  J-M is familiar with the specifications required by

25   government entities, including Real Parties, for accepting PVC pipe into water and

26   sewer systems and represents that its PVC pipe meets those specifications for the

27

28   [1] Underlined text added solely to comply with the Court's December 1, 2010 Order
[Dkt. 317].

FOURTH AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

Case 1:11-cv-01691-MSK-MJW   Document 1-1   Filed 06/28/11   USDC Colorado   Page 8 of 50
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 5 of 140   Page ID
#:14395

1  purpose of getting those government entities, including Real Parties, to purchase or

2  acquire J-M pipe.

3       7.    Defendants are also aware that many government entities, including

4  Real Parties, have experienced physical failures with J-M pipe, and Defendants are

5  aware that the cause of these failures is a result of Defendants' conduct.

6       8.    J-M's PVC water pipe products are used primarily in the "water main,"

7  the artery that typically runs down the middle of the street and carries water to the

8  service laterals that branch off from the main and supply the individual homes and

9  businesses, and the "transmission line," the trunk line that transports water from the

10  water treatment plant to the water mains. PVC pipe for use in water mains is

11  between 4" and 12" in diameter, whereas PVC pipe for use in the transmission line

12  is between 14" and 48" in diameter. J-M's PVC pressure pipe products for

13  "reclaimed water" applications are used primarily to transport untreated water to or

14  from water treatment plants. Unlike J-M's potable water pipe, which is blue in

15  color, reclaimed water pipe is generally purple in color. J-M's PVC sewer pipe,

16  which is green in color, is sold in a similar range of sizes to the range for water pipe.

17  J-M sells two general types of sewer pipe: "forced-sewer" pipe designed for use in

18  pressurized applications, and "gravity" sewer pipe for gravity-flow transport of

19  wastewater.

20       9.    To encourage and enable the Real Parties to purchase J-M pipe, J-M

21  provided the Real Parties with copies of J-M's catalogs describing J-M's PVC pipe

22  products. J-M's outside salespeople visited the Real Parties regularly and brought

23  new catalogs or updates to existing catalogs. J-M also provided the Real Parties

24  with copies of "new product bulletins" and other sales literature describing J-M's

25  products. J-M also provided copies of its catalogs and sales literature to distributors,

26  who in turn provided these materials to end-users, including the Real Parties, to

27  enable them to order J-M products through the distributor. In each of its sales

28  documents, J-M made repeated representations that its PVC pipe products conform

Case 1:11-cv-01691-MSK-MJW   Document 1-1   Filed 06/28/11   USDC Colorado   Page 9 of 50
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 6 of 140   Page ID
#:14396

1    to applicable industry standards for PVC pipe.

2         10.    Defendants understood and intended that the Real Parties would rely on

3    the materials J-M provided and the representations that J-M made for the purpose of

4    making their decisions to purchase or acquire J-M pipe.  Defendants understood and

5    intended that the Real Parties would receive materials and representations from

6    distributors, contractors, and developers, who in turn were relaying materials and

7    representations they had received from J-M, for the purpose of causing those Real

8    Parties to purchase or acquire J-M pipe.

9         11.    The Real Parties purchased, were deeded, or otherwise acquired

10   ownership of J-M pipe in a variety of ways.  For example, the Real Parties acquired

11   J-M pipe through direct transactions with J-M.  The Real Parties also acquired J-M

12   pipe through transactions involving contractors who installed J-M pipe for the Real

13   Parties, often through direct contracts with the Real Parties or through contracts with

14   land developers who installed the pipe for the Real Parties.   In each of these

15   instances, Defendants' false representations caused the submission of false claims

16   and caused contractors, distributors, developers, and/or the Real Parties' engineers

17   to falsely represent to the Real Parties that the pipe acquired by the Real Parties

18   conformed to the Real Parties' specifications.  Defendants understood and intended

19   that contractors, distributors, developers, and/or the Real Parties' engineers would

20   unwittingly pass on these misrepresentations to the Real Parties for the purpose of

21   getting the Real Parties to purchase or acquire the J-M pipe in question, as well as

22   induce them to make further acquisitions of J-M pipe.  As a result, the Real Parties

23   were deprived of money, property, and/or services that are recoverable under the

24   applicable False Claims Acts alleged herein.

25        12.    Contractors installed J-M pipe that is owned and maintained by the

26   Real Parties principally in two ways.  First, certain contractors installed pipe through

27   direct contracts with the Real Parties. These projects, often referred to as "Capital

28   Improvement Projects," are typically large-scale projects to install or update the

Case 1:11-cv-01691-MSK-MJW   Document 1-1   Filed 06/28/11   USDC Colorado   Page 10 of 50
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 7 of 140   Page ID
#:14397

1    Real Parties' water and sewer distribution systems.

2         13.    The second way that contractors installed J-M pipe for the Real Parties

3    was through contracts with developers.   These projects, often referred to as

4    "developer installs," typically involve contractors and/or developers installing pipe

5    that will be owned and maintained by the Real Parties as a condition of the Real

6    Party permitting the new land development and as a condition of the Real Party

7    providing water and distribution systems to the new land development.

8         14.    Typically the Real Parties will require that performance bonds be

9    posted in connection with pipe being installed for the Real Parties through developer

10   installs, in an amount equal to 100% of the projected cost of the installation for the

11   Real Parties.   In some cases, the Real Parties even pay for the costs of the materials

12   being used in developer installs or even help offset the costs of installation.  Because

13   J-M is the largest supplier of PVC pipe in the world, and because its sales personnel

14   routinely visit with the end-users of J-M pipe (including the Real Parties), J-M is

15   familiar with these common practices.   Because FPC is a leading supplier of PVC

16   resin and owned and managed J-M for 23 years, it is also familiar with these

17   practices. Defendants understand and intend that the Real Parties will be required to

18   provide money, property, and/or services as a direct result of the installation of pipe

19   for the Real Parties by the developers who install it.   Defendants understand and

20   intend that a demand for money, property, and/or services is being made on the Real

21   Parties as a direct result of these installations for the Real Parties.   This demand

22   includes, inter alia, the release of the Real Parties' monetary interest in those

23   performance bonds, the provision of water services to the new land development,

24   and the costs involved in overseeing and regulating the installation of the pipe by the

25   developers for the Real Parties.

26        15.    Developers and contractors know that the installation of pipe for the

27   Real Parties through developer installs is strictly regulated by the Real Parties

28   because developers know that the PVC pipe is being installed to become part of the

6

Case 1:11-cv-01691-MSK-MJW  Document 1-1  Filed 06/28/11  USDC Colorado  Page 11 of 50
Case 5:06-cv-00055-GW -PJW  Document 412  Filed 05/24/11  Page 8 of 140  Page ID
#:14398

1    Real Parties' water and sewer distribution systems. Accordingly, developers and

2    contractors intend and represent, directly passing on representations made by

3    Defendants, that the pipe installed for the Real Parties through developer installs

4    will meet the specifications set forth by the Real Parties for installation of PVC pipe

5    in their water and sewer distribution systems.

6        16.   As with Capital Improvement Projects and the contractors who install

7    them, only upon receiving certification from the developer that the project installed

8    by the developer for the Real Party was completed in accordance with the Real

9    Parties' specifications will the Real Party relinquish its monetary interest in

10   performance bonds and provide water and water maintenance services to the new

11   land development. In addition, as part of this process, a demand is made of the Real

12   Party by the developer, and the Real Party in fact expends money and/or property

13   and/or provides services in connection with regulating the pipe and other parts

14   installed by the developer for the Real Party.

15       17.   Even upon the release of the performance bond, some of the Real

16   Parties additionally require that developers post a warrant bond, normally in the

17   amount of 5% to 10% of the performance bond. These Real Parties will typically

18   relinquish their monetary interest in this warrant bond after one year.

19       18.   As with Capital Improvement Projects, Defendants' conduct in

20   connection with developer installs caused the submission of false claims in violation

21   of 31 U.S.C. § 3729(a)(1)(A), as well as similar provisions of the State FCAs at

22   issue in this litigation. At all times relevant to this action, section 3729(a)(1)(A)

23   provided for liability for "any person who ... A) knowingly presents, or causes to be

24   presented, a false or fraudulent claim for payment or approval." As a direct result of

25   Defendants' misconduct described herein, Defendants "cause[d] to be presented a

26   false or fraudulent claim for payment or approval" by developers who installed pipe

27   for the Real Parties. Defendants' conduct in supplying these developers with pipe

28   that did not meet the standards affixed to the pipe, despite Defendants'

7

Case 1:11-cv-01691-MSK-MJW    Document 1-1    Filed 06/28/11    USDC Colorado    Page 12 of 50
Case 5:06-cv-00055-GW -PJW    Document 412    Filed 05/24/11    Page 9 of 140    Page ID
#:14399

1  representations to the contrary, caused the developers to present false or fraudulent

2  claims for payment or approval.  As a result, the Real Parties were deprived of

3  money, property, and/or services that are recoverable under the applicable False

4  Claims Acts as alleged herein.

5        19.    As with Capital Improvement Projects, Defendants' conduct in

6  connection with developer installs also caused a false record or statement material to

7  a false or fraudulent claim to be made or used in violation of 31 U.S.C. §

8  3729(a)(1)(B), as well as similar provisions of the State FCAs at issue in this

9  litigation.  At certain times relevant to this action, section 3729(a)(1)(B), which was

10 then designated as section 3729(a)(2), provided for liability for any person who

11 "knowingly makes, uses, or causes to be made or used, a false record or statement to

12 get a false or fraudulent claim paid or approved by the Government."  At other times

13 relevant to this action, section 3729(a)(1)(B) provided for liability for "any person

14 who … B) knowingly makes, uses or causes to be made or used, a false record or

15 statement material to a false or fraudulent claim."  Defendants' false representations

16 caused developers, their contractors, and/or the Real Parties' engineers to falsely

17 represent to the Real Parties that newly constructed subdivisions and other private

18 projects were equipped with PVC pipe conforming to the Real Parties'

19 specifications.  As a result, the Real Parties were deprived of money, property,

20 and/or services that are recoverable under the applicable False Claims Acts as

21 alleged herein.

22       20.    Starting in at least 1991, J-M began knowingly to manufacture

23 substandard PVC pipes, selling them through distributors to military bases, State

24 Roads and Highway Projects, and public agencies, as well as to contractors

25 installing portions of the water distribution and sewer systems.  J-M falsely

26 represented to its customers, including the Real Parties, that the PVC pipe products

27 sold to them conformed to applicable industry standards when in fact the products

28 were made using inferior materials, processing, and tooling that resulted in their

Case 1:11-cv-01691-MSK-MJW  Document 1-1  Filed 06/28/11  USDC Colorado  Page 13 of 50
Case 5:06-cv-00055-GW -PJW  Document 412  Filed 05/24/11  Page 10 of 140  Page ID
#:14400

1    having substandard tensile strength, as measured by various tests. In making its

2    false representations to its distributors, contractors, and ultimate end-users, J-M

3    intended that its false representations be used to induce the Real Parties to purchase

4    its products. As a result, the Real Parties have suffered, and will continue to suffer,

5    substantial damage.

6        21.    Starting in at least 1991, a substantial percentage of the PVC pipe J-M

7    supplied had tensile strengths below the minimum required by applicable industry

8    standards and the Real Parties' contracts and specifications. As a result of the

9    diminished tensile strength, J-M's PVC pipe will have a shorter life span, be more

10    likely to swell and leak, and need to be replaced more quickly than pipe

11    manufactured to specification.

12        22.    The federal FCA and State FCAs provide that any person who

13    knowingly submits or causes to be submitted a false or fraudulent claim to a

14    governmental entity for payment or approval is liable for a civil penalty of up to

15    $12,000 for each such claim, plus three times the amount of the damages sustained

16    by the government. The Acts allow any person having information regarding a false

17    or fraudulent claim against the government to bring an action on behalf of himself

18    (the "qui tam plaintiff" or "relator") and the government and to share in any

19    recovery.

20        23.    Based on these provisions, qui tam plaintiff John Hendrix ("Hendrix")

21    seeks to recover damages and civil penalties arising from: (a) Defendants' actions in

22    presenting, or causing to be presented, false claims; (b) Defendants' actions in (i)

23    presenting, or causing to be presented, false records and statements to federal, state,

24    and local governmental entities to get false claims paid, or (ii) knowingly making,

25    using, or causing to be made or used, a false record or statement material to a false

26    or fraudulent claim; and, in the case of certain State FCAs, (c) Defendants' actions

27    as the beneficiaries of inadvertent submissions of false claims that Defendants

28    subsequently discovered were false but failed to disclose as false within a reasonable

FOURTH AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

Case 1:11-cv-01691-MSK-MJW   Document 1-1   Filed 06/28/11   USDC Colorado   Page 14 of 50
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 11 of 140   Page ID
#:14401

1  time.

2  **II.   PARTIES**

3      24.    Qui tam plaintiff Hendrix ("Relator") is a resident of Colonia, New

4  Jersey.  After graduating from college in December 2001, Relator began working for

5  Defendant J-M on July 8, 2002 in its corporate headquarters in Livingston, New

6  Jersey, as an engineer in J-M's Product Assurance Division.   Throughout his

7  employment at J-M, the majority of Relator's job duties involved advising J-M on

8  the technical aspects of claims brought by J-M's customers for failing or non-

9  conforming product.   To a lesser degree, Relator's job also involved sales and

10  customer service work, including advising current and prospective customers

11  (primarily fellow engineers) on technical aspects of J-M's products.  On November

12  9, 2005, a little over a week after Relator wrote a memo to J-M management

13  highlighting the fact that the tensile strength of J-M's PVC pipe was below that

14  required by Underwriters Laboratories Inc. ("UL") to qualify for the UL Mark

15  stamped on its pipes, J-M terminated Relator's employment.

16      25.    The Real Parties, on whose behalf Relator brings this suit, are the

17  United States, the States of California, Delaware, Florida, Illinois, Indiana, Nevada,

18  New Mexico, New York, and Tennessee, the Commonwealths of Massachusetts and

19  Virginia, the District of Columbia, the political subdivisions and public water and

20  sewer agencies set forth in Exhibit 1, and all other political subdivisions and public

21  water and sewer agencies within the States of California, Delaware, Illinois, Indiana,

22  Nevada, New Mexico, New York, and Tennessee, the Commonwealths of

23  Massachusetts and Virginia, and the District of Columbia, that purchased, or were

24  deeded or acquired from others, between January 18, 1996 and the present (except

25  in the case of the Real Parties in New Mexico and New York, the purchases must

26  have occurred between January 1, 2007 and the present),[2] certain types of J-M's

27

28  _____
[2] Underlined text added solely to comply with the Court's December 1, 2010 Order
[Dkt. 317].

FOURTH AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

Case 1:11-cv-01691-MSK-MJW   Document 1-1   Filed 06/28/11   USDC Colorado   Page 15 of 50
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 12 of 140   Page ID
#:14402

PVC pipe at issue in this litigation, as described more fully herein.  Exhibit 1 identifies by name, without limitation, some examples of the Real Parties that purchased, were deeded, or otherwise acquired J-M's PVC pipe between at least 1996 and the present.  Exhibit 2, incorporated herein, sets forth examples of federal projects for which the United States of America purchased, was deeded, or acquired J-M PVC pipe during that same period.  Exhibits 3(a) through 3(l), incorporated herein, set forth examples of the purchase, deeding, or acquiring of J-M PVC pipe by the Real Parties other than the United States of America.

26.   Defendant J-M is a Delaware corporation.   Prior to approximately 1990, J-M had its headquarters in Stockton, California.  From 1990 until October 2008, J-M had its headquarters at Nine Peach Tree Hill Road, Livingston, New Jersey.  Since October 2008, J-M has had its headquarters at 5200 West Century Boulevard, Los Angeles, California.   J-M still maintains a regional office in Livingston, New Jersey.

27.   During the relevant period, J-M manufactured its PVC pipe in at least 11 plants, including the following locations: Fontana and Stockton, California; Pueblo, Colorado; Adel, Georgia; Wilton, Iowa; Batchelor, Louisiana; Winnebago, Minnesota; Butner, North Carolina; McNary, Oregon; Meadville, Pennsylvania; and Wharton, Texas.

28.   As of June 22, 2007, J-M completed the acquisition of PW Eagle Inc., North America's second largest producer of PVC pipe, for approximately $400 million.  The new company has operated under the trade name JM Eagle™ since the merger.  (References to J-M herein after June 2007 are intended to and should be deemed to refer to JM Eagle as appropriate.)   With billions of dollars in annual sales, J-M was and remains the largest manufacturer of PVC pipe in the United States and the world at all times relevant hereto.

29.   Defendant FPC was formed in 1978 as a Delaware corporation, having its headquarters at Nine Peach Tree Hill Road, Livingston, New Jersey.  At all times

Case 1:11-cv-01691-MSK-MJW   Document 1-1   Filed 06/28/11   USDC Colorado   Page 16 of 50
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 13 of 140   Page ID
#:14403

1  relevant to this Complaint, FPC was a privately held, for-profit corporation and a

2  subsidiary of the Taiwan-based Formosa Plastics Group ("FPG").

3  **III.  JURISDICTION AND VENUE**

4      30.   This Court has jurisdiction over the subject matter of the federal FCA

5  action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which specifically

6  confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729

7  and 3730.  This Court has jurisdiction over the subject matter of the State FCA

8  actions pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b) because the State

9  FCA actions arise from the same transactions or occurrences as the federal FCA

10  action.

11      31.   This Court has personal jurisdiction over Defendants J-M and FPC

12  pursuant to 31 U.S.C. §3732(a), which provides that "[a]ny action under section

13  3730 may be brought in any judicial district in which the defendant, or in the case of

14  multiple defendants, any one defendant can be found, resides, transacts business or

15  in which any act proscribed by section 3729 occurred."   Section 3732(a) also

16  authorizes nationwide service of process.  During the relevant period, J-M operated

17  a foundry in Fontana, California, at which many of the fraudulent practices

18  occurred, and in October 2008, J-M moved its corporate headquarters to Los

19  Angeles, and thereby J-M transacted business in the Central District of California.

20      32.   Venue is proper in this district pursuant to 31 U.S.C. §3732(a) because

21  J-M can be found in, resides in, and/or transacts business in the Central District of

22  California and because many of the violations of 31 U.S.C. §3729 described herein

23  occurred within this judicial district.

24  **IV.  FPG'S CREATION OF FPC AND FPC'S CREATION OF J-M**

25      **A.  FPG's Creation of FPC**

26      33.   FPC was formed in 1978 as a Delaware corporation with its

27  headquarters at Nine Peach Tree Hill Road, Livingston, New Jersey.

28

FOURTH AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

Case 1:11-cv-01691-MSK-MJW  Document 1-1  Filed 06/28/11  USDC Colorado  Page 17 of 50
Case 5:06-cv-00055-GW -PJW  Document 412  Filed 05/24/11  Page 14 of 140  Page ID
#:14404

34. At all times relevant to this Complaint, FPC was a privately held, for-profit corporation and a subsidiary of FPG.

35. FPG claims to be the largest private enterprise in Taiwan, and it reports annual revenues in excess of $60 billion. It operates many businesses outside the United States, including plastic pipe manufacture, chemical manufacture, and PVC resin manufacture.

36. FPG was and is controlled by the Wang family. Y.C. Wang was FPG's founder in the 1950s and, until his death in the United States in 2008, its Chairman of the Board.

37. From the time of its creation in 1978, Y.C. Wang installed himself as Chairman of the Board of FPC. Y.C. Wang remained in this position until his death in 2008. As the Chairman of both FPG and FPC, Y.C. Wang viewed the development of the business of FPC in the United States as FPG's most important priority.

38. FPG was run in many ways as a family business. At one time or another, Y.C. Wang appointed all ten of his children to serve as executives at the companies he controlled, including at the two defendants in this action, FPC and J-M. To this day, defendant FPC and J-M are run by the children of Y.C. Wang.

39. FPC was created for the purpose of acquiring and operating businesses in the United States in the same industries that its parent, FPG, already operated in around the world. Thus, at the time of its formation, the strategy of FPC was to acquire and operate businesses in the United States that were complementary to FPG's existing businesses around the world and to vertically integrate all the businesses acquired into FPC specifically and FPG more generally.

40. Toward that end, in 1981, FPC acquired a vinyl chloride monomer plant in Baton Rouge, Louisiana. That same year FPC purchased a PVC plant in Delaware from Stauffer Chemical. In total, FPC bought 14 American PVC processors from 1980 to 1988. In 1988, acquisition of over 200 oil wells, a gas

13

Case 1:11-cv-01691-MSK-MJW   Document 1-1   Filed 06/28/11   USDC Colorado   Page 18 of 50
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 15 of 140   Page ID
#:14405

1   processing plant, and a pipeline company from Aluminum Company of America

2   extended FPC's vertical line of production upward to the basic ingredient of plastic:

3   petroleum.

4      **B.  FPC's Creation of J-M**

5      41.   As a key part of its strategy to acquire and operate complementary

6   businesses, in December 1982, FPC purchased the pipe division of the Johns-

7   Manville Corporation (including eight PVC pipe manufacturing plants) as part of

8   the bankruptcy proceedings of Johns-Manville.

9      42.   For the next 23 years, from December 1982 through November 2005,

10  FPC owned, operated, and controlled – for purposes of the federal FCA and the

11  State FCAs referenced herein – the PVC pipe manufacturing business it had

12  acquired from Johns-Manville and then expanded.

13     43.   FPC was the sole stockholder in the corporation it created, J-M

14  Manufacturing Company, as part of the acquisition of the pipe division of Johns-

15  Manville.  At relevant times, J-M was and is the world's largest manufacture of

16  PVC pipe.

17     44.   For a time, J-M's management consisted largely of former Johns-

18  Manville employees who reported to a Board of Directors appointed and controlled

19  by FPC.   However, beginning in the early 1990s, most of these management

20  employees began to leave or retire, and employees from FPC or sister companies of

21  FPC were brought in to work at J-M.

22     45.   In 1990, the Chairman of FPC installed his youngest son, Walter Wang,

23  at J-M.  Walter was only 25 years old, had graduated from college only three years

24  before, and had little to no practical experience in managing a company, let alone

25  the world's largest manufacturer of PVC pipe.  In the three years between graduating

26  college and joining J-M, Walter Wang had spent time at FPG as a factory machinery

27  operator, a floor supervisor, and an internal corporate consulting project leader.

28

Case 1:11-cv-01691-MSK-MJW   Document 1-1   Filed 06/28/11   USDC Colorado   Page 19 of 50
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 16 of 140   Page ID
#:14406

46.     J-M, whose Board members were substantially the same as the Board members of FPC, appointed Walter Wang as a Vice President of J-M in 1994, an Executive Vice President in 1996, and President of J-M in 2000.  However, during the 1990s, Walter Wang signed certain internal memoranda as "president" and issued communications from "the President's Office."  He took over the position of CEO from his father shortly after 2000 and remains J-M's President and CEO today.  Walter Wang was unqualified by education and training to assume these various senior positions, which he was given because he was FPC Chairman Y.C. Wang's son and FPC approved it.

47.     Shortly after Walter Wang joined J-M, FPC required J-M to move its headquarters from California and merge its headquarters operations into FPC's existing headquarter operations at Nine Peach Tree Hill Road in Livingston, New Jersey.  FPC and J-M shared these headquarters, in a building that FPC purchased in 1982, for at least the next 18 years.  As set forth in detail in Section D. below, at headquarters FPC provided many administrative and support functions for its wholly owned subsidiary, J-M.

**C.     FPC Intended to Run and Did Run J-M as a Vertically Integrated Business from 1982 until at least 2005**

48.     FPC, like all FPG companies, adopted a top-down, vertically integrated management model.  As the President and CEO of J-M acknowledged in 2005: "since the inception of Formosa Plastics our business strategy has place[d] tremendous emphasis on vertical integration.  This vertical integration is the basis which keeps the upstream and down stream strongly competitive vs our competitors in the industry.  This is a daily competitive stance that Formosa Plastics persist [sic] on everyday."

49.     One of the key mechanisms FPC employed to maintain and enhance this vertical integration was to install an overlapping corporate governance and management structure at J-M and FPC's other subsidiaries and affiliates.

15

Case 1:11-cv-01691-MSK-MJW    Document 1-1    Filed 06/28/11    USDC Colorado    Page 20 of 50
Case 5:06-cv-00055-GW -PJW    Document 412    Filed 05/24/11    Page 17 of 140    Page ID
#:14407

50.    For example, FPC's chairman installed himself as J-M's chairman at the time of its creation in 1982 and was still being listed in corporate filings as chairman of both companies as late as 2006.    Thus, the same person who had ultimate control over the business decisions of FPC also had ultimate control over the business decisions of J-M.

51.    This was far from the only overlap in key executives.    J-M and FPC had numerous overlapping management and common executive personnel. Moreover, like Walter Wang, many of these overlapping executives were selected because they were members of FPC Chairman Y.C. Wang's family and were expected to conduct their operations consistent with the direction of FPC Chairman Y.C. Wang and FPC.    During time periods relevant to this Complaint, persons holding executive or management positions simultaneously in both J-M and FPC include the following:

  a) Y.C. Wang, Walter Wang's father, was the Chairman of the Board of Directors of J-M, FPC, and both companies' ultimate parent, FPG.  Y.C. Wang was also sometimes listed in public filings as J-M's CEO.

  b) Y.T. Wang, Y.C. Wang's brother and Walter Wang's uncle, was a Director of both J-M and FPC and Vice Chairman of J-M.

  c) C.S. Wang was a Director of both J-M and FPC.

  d) C.T. Wang was a Director of both J-M and FPC.

  e) Susan Wang, Y.C. Wang's daughter and Walter Wang's sister, was a Director of both J-M and FPC.  She also served at various times as Vice President and Assistant to the President of FPC, and was the de facto head of FPC.  She was the Deputy CEO of FPG and served on its management committee.

  f) William Wong, Y.C. Wang's nephew and Y.T. Wang's son, was a Director of both J-M and FPC.  He was President and CEO of FPG and served on its management committee.

16

Case 1:11-cv-01691-MSK-MJW   Document 1-1   Filed 06/28/11   USDC Colorado   Page 21 of 50
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 18 of 140   Page ID
#:14408

g) C.T. Lee was a Director of both J-M and FPC as well as President of FPC. He served on the management committee at FPG.

h) Charles McAuliffe was corporate secretary of both J-M and FPC.

i) Alice Nightingale replaced McAuliffe as corporate secretary of both J-M and FPC and, as FPC in-house counsel, provided legal services to both companies.

j) H.C. Lee was treasurer for both J-M and FPC.

52.     Moreover, in a speech in 2005, the CEO and President of J-M recognized that all of FPC's business interests in the United States were being vertically integrated, that there was no distinction between the origins of FPC and its wholly owned subsidiary, J-M, and that this was consistent with the business practices of the conglomerate to which it belonged:   "Three decades ago our company started doing business in my father's basement in New Jersey.  Today we operate 20 manufacturing facility [sic] throughout 14 states with total revenue of over 4 billion dollars.  Of course we did not start our business in the United States without a foundation as our parent company in Taiwan started producing plastic raw material back in 1954.  Yes, this foundation gave us technical and manufacturing know how, as well as some financial capability."

53.     This vertical integration and control manifested itself operationally as well.   For example, during a period of product shortage following Hurricane Katrina, the President of J-M told one of the other businesses controlled by FPC, a resin manufacturer, how to best implement this vertical integration:   "At this time of shortage and confusion I must emphasis this key aspect of our business strategy. Upstream must make it a top priority to supply downstream its requested quantities."

54.     J-M also made clear to its distributors that it was vertically integrated into the business of FPC.  In a presentation by J-M to ACT Pipe & Supply Inc. dated July 7-10, 2002, J-M labeled one slide "Vertical Integration" and stated:

FOURTH AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

Case 1:11-cv-01691-MSK-MJW   Document 1-1   Filed 06/28/11   USDC Colorado   Page 22 of 50
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 19 of 140   Page ID
#:14409

- "Our sister company, [FPC], has three PVC & HDPE resin facilities in Texas and Louisiana to ensure company a stable and consistent supply of raw material."

- "Through its operations, [FPC] is vertically integrated from the production of basic feedstock through the final compounding of PVC & HDPE resin."

- "Our relationship allows control of consistency of quality in our raw materials at a rational cost."

**D.    FPC Intertwined J-M's Business Operations With Its Own**

55.    From 1990 to 2008, J-M occupied the same office building in Livingston, New Jersey as FPC and several other FPC subsidiaries and shared significant support services.

56.    FPC's consolidated financial statements included J-M's audited financial information. FPC could not issue its audited financial statements until J-M had supplied FPC with J-M's audited financial statements.

57.    Until October 2008, senior J-M and FPC Finance personnel met together at least two to three times per week.

58.    FPC's personnel reconciled the books of the various FPC entities, including intercompany transactions, on a daily basis. At the end of every business day, J-M transferred its profits to FPC. This daily transfer, which did not include amounts retained for regular expenditures, occurred until at least November 1, 2005.

59.    FPC loaned significant funds to J-M. For example, as of December 2004, J-M was financed by FPC under an informal loan arrangement that provided for interest at LIBOR plus an applicable margin (approximately 2.51% at December 31, 2004). The obligation was unsecured and payable on demand, except for a portion ($50 million) that was due after December 31, 2005.

60.    All losses stemming from asbestos-related liability inherited from the Johns-Manville Corporation were split equally between FPC and J-M.

Case 1:11-cv-01691-MSK-MJW   Document 1-1   Filed 06/28/11   USDC Colorado   Page 23 of 50
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 20 of 140   Page ID
#:14410

61.   J-M received legal services from FPC's in-house lawyers, including Alice Nightingale.   Indeed, prior to Fernando Cruz joining J-M's in-house legal department in 2004, J-M had no in-house legal counsel, and FPC lawyers had complete responsibility for and authority over all of J-M's needs for legal advice that were not referred to outside counsel.

62.   J-M received tax services from FPC's legal and accounting departments. For example, in September 2005, FPC informed J-M that "since JM is still part of Formosa USA group and the [charitable] contribution was made by the parent company on behalf of the subsidiaries," an inter-company allocation for tax purposes was appropriate.  FPC also worked with outside accountants and auditors on J-M's behalf.   For example, in January 2006, FPC advised their outside accountants, RSM McGladrey: "[T]he following are the questions related to JM 2005 state tax returns.   Please provide the estimate fees for JM management's approval."

63.   J-M leased its office facility on a month-to-month basis from FPC.  For example, FPC charged J-M $456,000 for rent in 2004.

64.   FPC also sold certain administrative and other services to J-M.   The cost of those services was $1,120,000 in 2004 and $86,000 in 2005.  In just the first two months of 2006, right after FPC sold J-M to Walter Wang, J-M paid FPC $89,013 for "other professional service expenses" and $8,655 for postage expenses. From 1990 to June 2004, J-M used FPC's telephone system.

65.   FPC provided various insurance programs for J-M.  J-M was named as an additional insured on many of FPC's insurance policies, not only before the 2005 sale to Walter Wang but at least through June 30, 2006.

66.   FPC ran and administered the individual employee insurance benefits for J-M, including life insurance and health insurance. For example, in March 2004, Barry Lin advised Roger Toth: "Please work with FPC Human Resources to square away the problems addressed below."  Likewise, FPC asked J-M for an updated list

Case 1:11-cv-01691-MSK-MJW   Document 1-1   Filed 06/28/11   USDC Colorado   Page 24 of 50
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 21 of 140   Page ID
#:14411

1  of J-M HQ Sales personnel whose annual salary was based on their commissions so

2  that FPC could calculate their Basic Life Insurance and their Supplemental Life

3  Insurance dollar amounts.

4       67.    FPC coordinated and administered J-M's workers' compensation

5  claims.

6       68.    FPC arranged for and administered property insurance for J-M

7  facilities.  For example, in November 2004, Norberto J. Torres (FPC's Director of

8  Finance and Risk Management) advised all J-M plant managers of the need for

9  property insurance appraisal visits.    All reports of such visits to J-M plants were

10  thereafter sent to Mr. Torres at FPC.

11       69.    FPC helped J-M negotiate pricing with J-M's suppliers of raw materials

12  and consolidated blanket order contracts for the benefit of J-M.

13       70.    FPC was responsible for the financial and insurance side of defective

14  pipe claims made by customers purchasing J-M pipe.  Thus, FPC was acutely aware

15  that J-M was manufacturing pipe that was defective and non-conforming.    Mr.

16  Torres, FPC's Director of Finance and Risk Management, interacted on a regular

17  basis with J-M personnel, including Relator and Kaushal Rao, regarding pending

18  claims and litigation.  For example, in April 2003, Mr. Torres contacted Mr. Rao

19  regarding the U.S. Filter litigation because AIG wanted information about J-M's

20  self-insured retention.  Mr. Torres asked Mr. Rao for "an up to date accounting of

21  the current Legal Bills on this case."

22       71.    As another example of FPC's monitoring of J-M's customer claims,

23  Ken Nasto, J-M Director of Finance, sent a March 21, 2006 email to multiple J-M

24  and FPC personnel about a new customer claim.  In the email, Nasto states: "From

25  what I can gather from the below emails, a section of our 10" DR18 pipe exploded

26  resulting in one injury and undisclosed (as of yet) property damage.  I am notifying

27  Norberto Torres of this as well given the fact that at present our liabi[]lity coverage

28

FOURTH AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

Case 1:11-cv-01691-MSK-MJW   Document 1-1   Filed 06/28/11   USDC Colorado   Page 25 of 50
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 22 of 140   Page ID
#:14412

1   is still under the control of FPC, at which point I am sure that a representative from

2   our insurance carrier will be dispatched to monitor our liability . . . ."

3                    The Claims Review Process

4          72.    The Product Assurance Department of J-M and FPC's Finance and

5   Risk Management Department worked very closely in monitoring and resolving a

6   number of claims made for substandard pipe.  In so doing, and as discussed in more

7   detail below, FPC's Finance and Risk Management Department had been told and

8   therefore knew all of the following during the Relevant Period: (a) J-M sold large

9   quantities of PVC water and sewer pipe with the intention that this pipe ultimately

10  would be purchased and acquired by government users, including the Real Parties

11  named in this case; (b) J-M did in fact sell large quantities of PVC water and sewer

12  pipe ultimately purchased and acquired by government users, including the Real

13  Parties named in this case; (c) some of these government users experienced

14  problems with this pipe and claims were made for reimbursement; (d) FPC was

15  involved with several of these claims and had been told and was aware that the

16  reason why these government users experienced problems with this pipe was

17  because J-M's representations on the pipe itself concerning the quality of the pipe

18  were false; (e) J-M pipe was stamped with the UL mark, but FPC was told that none

19  of J-M's pipe had satisfied the UL requirements for some time, and that J-M was, as

20  of 2003, incapable of satisfying those requirements for any of its C900, C905, or

21  ASTM D2241 pipe; and (f) despite this knowledge, FPC did nothing to stop false

22  claims from being submitted to the government entities, including the Real Parties.

23         73.    Complaints and claims related to J-M pipe usually originated in a

24  phone call to a J-M salesperson.  Upon receiving such a call, the J-M salesperson

25  would fill out certain portions of a standard form called a Complaint Report, noting

26  basic information about the claim and the claimant.  (See Exhibit 53, incorporated

27

28

Case 1:11-cv-01691-MSK-MJW   Document 1-1   Filed 06/28/11   USDC Colorado   Page 26 of 50
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 23 of 140   Page ID
#:14413

1    herein [FILED UNDER SEAL],[3] for an example.)  The salesperson then delivered
2    the Complaint Report to the Product Assurance Department for follow-up action.

3        74.    After receiving a Complaint Report, the Product Assurance
4    representative would call the contact person at the complainant and get further
5    details about the nature of the complaint or claim, recording the information learned
6    on the Complaint Report.  The Product Assurance representative would create a
7    hard-copy file and also create an electronic record in J-M's AS400 system, called a
8    "Customer Claim Data Entry" form.  In addition, depending upon where the pipe
9    had been manufactured, a Quality Control Supervisor at that plant might also supply
10   certain additional information that Quality Control at headquarters would input into
11   this electronic form.  (See Exhibit 54, incorporated herein [FILED UNDER SEAL],
12   for a sample.)  In this way, every claim for which a file was opened at J-M was
13   recorded in an electronic database.  The database was continually updated and
14   reports of open claims could be printed from it as needed.

15       75.    During the Relevant Period, the Product Assurance Department
16   reported to the Vice President of Sales (Kai Cheng).  At various times relevant to the
17   Complaint, the employees of the Product Assurance Department included Doug
18   Boitz, Alwyn Go, Michael Pereira, Mai Huynh, and the Relator, John Hendrix.  The
19   procedures for claims handling used by the Product Assurance Department during
20   the Relator's period of employment with J-M (2002-2005) dated back at least to the
21   mid-1990s.

22       76.    At least once every three months, employees from J-M's Product
23   Assurance Department met with and reported to FPC's Finance and Risk
24   Management Department any open claims for defective, sub-standard, and non-
25   conforming pipe that represented a potential exposure of more than $15,000, or open

26   ───────────────
27   [3] Where exhibits hereto are noted as "FILED UNDER SEAL," that is done because
     J-M and/or FPC have marked such documents "Confidential."  Those exhibits have
     been filed under seal – and placeholders included in the public version of this
28   pleading – pursuant to the Court's Stipulation and Order of September 22, 2006
     governing confidentiality of documents, pending discussions with Defendants.

FOURTH AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

Case 1:11-cv-01691-MSK-MJW   Document 1-1   Filed 06/28/11   USDC Colorado   Page 27 of 50
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 24 of 140   Page ID
#:14414

claims in any amount that might lead to litigation. To prepare for such meetings, the Product Assurance representative ran and printed reports on the AS400 system for active claims for defective and non-conforming pipe in excess of $15,000. For each claim, the report set forth information for various fields, including those also included in the Customer Claim Data Entry form. The Product Assurance representative then pulled the hard-copy files that corresponded to each of the open claims on the report and reviewed the documentation to determine J-M's likely exposure.

77.   The Product Assurance representatives then met with Mr. Norberto Torres, Director of FPC's Finance and Risk Management Department, in FPC's office for several hours to review each claim on the report, one by one. For each claim, the Product Assurance representatives explained and discussed with Mr. Torres background on the claim (including the owner and end user of the pipe, the amount, value, and location of the defective and non-conforming pipe), a status update, findings about the pipe at issue, conclusions and recommendations as to whether the claim should be denied or allowed, and other relevant details of the claim. They also discussed the likelihood of litigation emanating from any of the claims, as well as the status of ongoing litigation matters. The information contained in the AS400 report and the hard-copy claims files themselves were routinely shared with Mr. Torres.

78.   In turn, Mr. Torres would sometimes discuss certain of these claims with other J-M employees and officers, including Kai Cheng, the head of Sales for J-M, and also with Walter Wang, the President and CEO of J-M.

79.   If a claim resulted in litigation, Mr. Torres was the person responsible for monitoring and managing the handling of the claim with the insurance company, including negotiating and ultimately approving settlements of the claims. These practices continued even after J-M hired its own in-house lawyer, Fernando Cruz, in 2004.

Case 1:11-cv-01691-MSK-MJW   Document 1-1   Filed 06/28/11   USDC Colorado   Page 28 of 50
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 25 of 140   Page ID
#:14415

## Some Specific Examples of Claims FPC Knew Were Government Claims

80.   As a result of these meetings every three months between Mr. Torres of FPC and J-M's Product Assurance representatives, Mr. Torres was specifically aware that J-M had been selling, and was continuing to sell, sub-standard PVC pipe that was intended to be sold and acquired, and in fact was being sold to and acquired by, government entities, including those government entities running state and municipal water and sewer systems.  For example, Mr. Torres was told about and was therefore aware of the following claims, as well as many of the details of those claims, including that the ultimate end users of the J-M pipe in question was a government entity:

a) Q05-H-23  Las Vegas, Nevada (High Desert Prison Project where the State of Nevada was the end user) – 18" DR 25 AWWA C905 PVC Pipe – 10,000 feet installed at the Southern Nevada Correctional Center.  The State of Nevada Public Works complained that the main waterline direct to the prison for 3000 inmates, which was constructed in 1999 and placed in service in September 2000, had failed five times since April 2005.   (See Exhibit 55 [JME00060277/3], incorporated herein [FILED UNDER SEAL].)

b) Q00-L-02  Otay Water District, Chula Vista, California (public water system) (16" Water Mains Project) – 16" DR 18 AWWA C905, 16" DR 25 AWWA C905, 12" DR 14 AWWA C900, 8" DR 14 AWWA C900, 12" DR 18 AWWA C900, 10" DR 18 AWWA C900, 8" DR 18 AWWA C900 – more than 20,000 feet installed – evolved into litigation asserting claims for breach of contract and negligence, seeking at least $2.5 million for defective, leaking pipe.  FPC's files contained numerous documents confirming its awareness of this claim and lawsuit, and Mr. Torres was intimately involved in handling the

24

Case 1:11-cv-01691-MSK-MJW   Document 1-1   Filed 06/28/11   USDC Colorado   Page 29 of 50
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 26 of 140   Page ID
#:14416

1     insurance aspect of this litigation. (See Exhibit 56 [FPCUSA0025245-

2     51; 25255-56; 25266-75; 25291; 25294; 25297-99; 25302-16; 25330-

3     43], incorporated herein [FILED UNDER SEAL].)

4    c) Q99-391   Sampson County Water System Improvement Project for

5     Water and Sewer District No. 2, County of Sampson, North Carolina

6     (public water system) – 12" RT 200 D2241 PVC pipe – evolved into

7     litigation asserting claims for breach of contract in connection with

8     defective ASTM D-2241 pipe, alleging among other things that "the J-

9     M Manufacturing Quality Control Representative [who supplied the

10    pipe] stated that some of the pipe delivered to the project had been

11    rejected at the plant and should never have been shipped to the project."

12    (See Exhibit 57 [JMM 111647-58; JMM109650, incorporated herein

13    [FILED UNDER SEAL]; see also paragraphs 83-84 *infra*.)

14    d) Q98-280/A   City of Bradenton, Florida – 18" DR 25 PVC pipe –

15    15,300 feet reclaimed water transmission main installed in 1993 – J-M

16    Internal Recommendation and Authorization recommended payment of

17    $107,284.80 in reimbursement of pressure testing costs related to

18    defective pipe. (See Exhibit 58 [FPCUSA0034029-30; 34078; 34114-

19    40], incorporated herein [FILED UNDER SEAL, EXCEPT FOR

20    34119-22 AND 34125-40].)

21    e) Q97-288   Westmoreland County, Pennsylvania (public water system)

22    (O'Barto claim) – 8" DR 14 PVC pipe – pipe explosion resulted in

23    personal injury litigation. FPC's files contained numerous documents

24    confirming its awareness of this claim and lawsuit. (See Exhibit 59

25    [FPCUSA0025391-95; 25401; 25405-06; 25344-66; 25369; 25389-90;

26    25396-400; 33769-70], incorporated herein [FILED UNDER SEAL];

27    see also paragraphs 85-86, *infra*.)

28

FOURTH AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

Case 1:11-cv-01691-MSK-MJW   Document 1-1   Filed 06/28/11   USDC Colorado   Page 30 of 50
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 27 of 140   Page ID
#:14417

f) Q02-G-23   Sewerage Works Improvements, Town of Andover, Massachusetts (public water and sewer system) – 18" SDR 35 PVC Pipe – replacement of pipe on River Road – claim submitted for $15,421.96 for out-of-spec pipe. (See Exhibit 60 [JMM041683; 041670-74], incorporated herein [FILED UNDER SEAL].)

81.   In addition to knowing the specific identity of government entities to whom claims for payment of J-M pipe had been submitted, FPC also knew that federal, state, and municipal entities were a substantial part of J-M's customer base. For example:

a) As early as 1997, in one of its marketing brochures, FPC delineated: (1) its familiarity with the standards to which J-M manufactured PVC pipe that federal, state, and municipal entities required; and (2) set forth J-M's "major PVC pipe product lines" by reference to "Municipal Water Pressure Pipe" subject to "Specifications & Approvals" including ASTM D2241, NSF, AWWA C900, UL, FM, and AWWA C905. (See Exhibit 61 [FPCUSA0034154-56; 34181-83], incorporated herein.)

b) In a November 14, 2001 letter to Walter Wang as President of J-M, FPC's Dick Heinle, Vice President/General Manager, Vinyl Division, expressed concern about "the future viability of the PVC pipe demand/industry" and sought Mr. Wang's knowledge of "industry intelligence" concerning projected demand. Mr. Heinle wrote: "For example, if J-M continued at 30 million pounds, Formosa must continue at idled capacity. However, **if J-M has knowledge of upcoming municipal projects that would consume large quantities of PVC pipe**, J-M may need to increase intended volumes [of resin purchase]." (See Exhibit 62 [FPCUSA0001678], incorporated herein [FILED UNDER SEAL]; emphasis added.)

FOURTH AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

Case 1:11-cv-01691-MSK-MJW   Document 1-1   Filed 06/28/11   USDC Colorado   Page 31 of 50
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 28 of 140   Page ID
#:14418

c) In an email written by FPC Director Norberto Torres on January 20, 2004, copying others at FPC, entitled "JM Claims Update," Torres referred to a mediation that had occurred in a matter involving defective J-M pipe where "**the City**" had made a significant demand for payment because of the defective pipe. (See Exhibit 63 [FPCUSA0033778], incorporated herein [FILED UNDER SEAL]; emphasis added.)

82.     In addition to knowing specifically and generally that claims were being submitted to government entities, Mr. Torres was fully aware that these claims were false, as Relator comprehensively informed Mr. Torres about the manufacturing deficiencies that resulted in substandard and non-conforming pipe. During these discussions, Relator regularly provided FPC with reports of test results performed on failing pipe from claims, including those where government entities were the end-users of J-M pipe.    Indeed, Relator specifically provided Mr. Torres with reports of test results that showed that J-M pipe had failed critical tensile strength test requirements mandated by the very standards that J-M affixed to its pipe so it could sell its pipe to government entities that required these standards to be met.

83.     In early 2003, in discussions involving Relator, Kaoshal Rao of J-M, and Mr. Torres of FPC, Relator specifically told Mr. Torres that J-M had not met for some time, and was currently not capable of meeting, the UL Standard 1285 ("UL 1285") requirement for Longitudinal Tensile Strength for all C900, C905, and ASTM D 2241 pipe being manufactured **across the entire company**.    The discussion grew out of litigation filed against J-M by Sampson County, North Carolina, involving defective and non-conforming ASTM D2241 pipe that the County had installed.  The primary issue in the Sampson County litigation involved the tensile strength of the pipe, which failed tensile strength testing with results less than 7,000 psi. As Relator knew and discussed with Mr. Torres, ASTM D2241 pipe

27

Case 1:11-cv-01691-MSK-MJW   Document 1-1   Filed 06/28/11   USDC Colorado   Page 32 of 50
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 29 of 140   Page ID
#:14419

1    was manufactured from the same materials using the same process as C900 and

2    C905 pipe. Therefore, the failing results on the tensile strength tests performed on

3    pipe samples portended massive problems not only with ASTM D2241 pipe, but

4    also with the tensile strength of J-M's C900 and C905 pipe.

5        84.    Accordingly, FPC knew, no later than early 2003, that J-M's past and

6    continued use of the UL 1285 stamp on any of its C900 and C905 PVC pipe

7    constituted a misrepresentation of fact. And as discussed above, FPC also knew that

8    claims for payment were being submitted to government end-users for C900 and

9    C905 pipe that bore the UL 1285 stamp. Knowing that false claims were being

10   submitted to government entities, FPC did nothing to try to stop J-M from causing

11   the submission of those false claims to government entities, including the Real

12   Parties.

13       85.    In addition, during the Summer of 2003, Relator discussed with Mr.

14   Torres a claim involving J-M pipe that exploded and caused serious personal injury

15   to a person named Richard O'Barto. The O'Barto claim involved an explosion that

16   occurred in 1997 while Mr. O'Barto was laying J-M C900 pipe for the Derry Area

17   Water System (a public water system) project in Westmoreland County,

18   Pennsylvania. The explosion caused serious injuries to Mr. O'Barto, including brain

19   damage. A personal injury lawsuit seeking $10 million was brought against J-M in

20   Pennsylvania state court in 1999. Relator was later consulted in connection with

21   that ongoing lawsuit. Relator was asked to read and comment on plaintiff's expert

22   report, which opined that the cause of the pipe explosion was locked-in stresses

23   created during the pipe manufacturing process, which reduced the strength and

24   viability of the pipe. Relator located in J-M's files, and discussed with Mr. Torres,

25   reports prepared by Johns-Manville discussing locked-in stresses that supported Mr.

26   O'Barto's theory of liability. (In fact, following the issuance of those reports,

27   Johns-Manville created and implemented quality control tests at the plants to

28   measure locked-in stresses – tests J-M dropped and no longer performed after

FOURTH AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

Case 1:11-cv-01691-MSK-MJW    Document 1-1    Filed 06/28/11    USDC Colorado    Page 33 of 50
Case 5:06-cv-00055-GW -PJW    Document 412    Filed 05/24/11    Page 30 of 140    Page ID
#:14420

1  buying the business from Johns-Manville.)  Relator also became aware that the

2  defective pipe that injured Mr. O'Barto was UL-listed pipe that failed tensile

3  strength testing performed after the explosion, the very same tests that Relator had

4  discussed with Mr. Torres in connection with Sampson County earlier in 2003.

5      86.   Relator discussed the O'Barto lawsuit with Mr. Torres on multiple

6  occasions.  During those discussions, Relator discussed with Mr. Torres the J-M-

7  Pipe defects due to excessive locked-in stresses and explained to him that the most

8  likely cause was that J-M ran its extruders at an accelerated rate.  Relator also

9  discussed with Mr. Torres the failing tensile strength results on the C900 pipe, as

10  well as observations and comments made by Mr. Fassler and Mr. Yang concerning

11  the inability of J-M to conform to the tensile strength requirements of the standards.

12  Relator discussed all this information with Mr. Torres on multiple occasions in the

13  context of the O'Barto litigation because Relator was concerned that the facts would

14  come to light in the lawsuit and thereafter become public information, thereby

15  raising the prospect that other PVC pipe previously sold and still being sold by J-M

16  would be revealed as sub-standard.

17      87.   As a result of the communications detailed in paragraphs 72-86 above,

18  at the very latest FPC had clear knowledge by 2003 that J-M had sold and was

19  continuing to sell defective and substandard pipe that was being purchased or

20  otherwise acquired by government entities through claims that were being submitted

21  to these government entities.  Despite this knowledge, FPC took no steps to disclose

22  this knowledge to any such government entity at any time thereafter.

23      88.   FPC was further aware of J-M's common practices of failing to

24  acknowledge non-conformities to complaining customers and of falsely denying

25  claims that in fact involved defective product.

26    **E.**    **FPC's Sale of J-M to Walter Wang, the CEO of J-M Appointed by**

27          **FPC**

28

Case 1:11-cv-01691-MSK-MJW   Document 1-1   Filed 06/28/11   USDC Colorado   Page 34 of 50
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 31 of 140   Page ID
#:14421

89.    FPC owned, operated, and controlled J-M for purposes of the federal FCA and the State FCAs referenced herein for a period of 23 years, until at least November 2005. On November 1, 2005, Walter Wang, the President and CEO of J-M who had been appointed by FPC, purchased J-M from FPC for a purported sale price of $100 million, using two holding companies he created for that purpose.

90.    Since FPC's sale to Walter Wang was a private transaction, there is little documentation publicly available about it, although FPC's own auditors apparently considered the sale price to have been less than the full market value for the company. Walter Wang's subsequent acquisition of J-M's smaller competitor, PW Eagle, for $400 million within two years of his acquisition of J-M also suggests that FPC likely agreed to sell J-M to Walter Wang at less than fair market value. The available public record shows that as part of FPC's 2005 sale to Walter Wang, J-M borrowed $300 million from a third-party lender, a portion of which was used to repay borrowing from and other amounts that were due to FPC of approximately $176 million.   Loan proceeds of $70 million were used to pay a portion of the purchase price to FPC and the balance of the purchase price of $30 million was funded by a capital contribution by one holding company (Guiding Light Ventures, Inc.) to the other (Pipe Dream Acquisition, Inc.).

91.    In connection with this transaction, the Chairman of FPC guaranteed a $30 million loan from the Bank of Taiwan to help Walter Wang finance his purchase of J-M from FPC.

92.    Even after Walter Wang purchased J-M, J-M still represented itself as part of the FPG family and emphasized vertical integration.   For example, in a presentation to United Pipe & Supply dated February 1, 2006, the Agenda included:

- o  Formosa Family
  - ▪  Formosa Corporate Overview
  - ▪  Vertical Integration
- o  J-M Manufacturing

Case 1:11-cv-01691-MSK-MJW   Document 1-1   Filed 06/28/11   USDC Colorado   Page 35 of 50
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 32 of 140   Page ID
#:14422

- Introduction
- JMM Overview
- New Corporate Identity
- Comprehensive Product Line
- VIP Program

93.    Likewise, in April 2006, months after he had purchased J-M from FPC, Walter Wang still introduced himself to customers such as Home Depot as follows: "My name is Walter Wang.  I am the president and CEO of J-M Manufacturing and one of the owner of Formosa Plastics Corporation (J-M's parent company) – even though Formosa Corporation had a revenue of 45 billion US dollars last year, we certainly see Home Depot as a company we need to learn from...."

94.    Even now, more than five years after Walter Wang purchased J-M from FPC, FPG still lists J-M as one of its U.S. operations on the FPG website (http://www.fpg.com.tw/html/eng/org.htm).

**F.    FPC Was Involved In and Aware of the Formulation and Testing of J-M Pipe and Its Components**

95.    FPC was not merely a supplier of raw materials to J-M, as were Georgia Gulf Chemicals & Vinyls, and Shintech, Inc.  Rather, FPC was deeply involved in and aware of the formulation, testing, and marketing of J-M pipe and its components.

96.    J-M purchased PVC resin from several suppliers, including an FPG affiliate in Taiwan, but the primary supplier to the majority of J-M's plants was FPC, which serviced those plants from its facilities in Baton Rouge, Louisiana and Point Comfort, Texas.  For example, according to a property insurance survey at the Wharton plant performed by Starr Technical Risks Agency, Inc., "[t]his plant is highly dependent on the Formosa petrochemical complex nearby in Point Comfort for the receipt of the majority of its PVC resin feedstocks."  As of February 2007, the primary source of resin for J-M facilities that made small diameter products was

FOURTH AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

Case 1:11-cv-01691-MSK-MJW   Document 1-1   Filed 06/28/11   USDC Colorado   Page 36 of 50
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 33 of 140   Page ID
#:14423

1  FPC Baton Rouge (for Adel, Georgia; Batchelor, Louisiana; McNary, Oregon; and

2  Stockton, California) and FPC Point Comfort (for Stockton, California and McNary,

3  Oregon).

4      97.    When one of J-M's other resin suppliers had problems servicing their

5  obligations to J-M, FPC rearranged its business plan to accommodate the

6  unreliability of service from the other supplier and took steps to supply J-M.

7      98.    According to Will Fassler ("Fassler"), a former employee and senior

8  engineer in the Research and Development Department in J-M's Stockton,

9  California plant, at FPC's request and for FPC's convenience, the formula data

10  sheets for PVC compounds from FPC were generalized and reduced in number.

11  This generalized FPC blend code system failed to identify significant changes in

12  additive suppliers. These unidentified material changes sometimes caused problems

13  and made troubleshooting difficult.

14      99.    Walter Wang expected FPC to supply the majority of its resin needs,

15  and FPC did supply the majority of J-M's resin needs.   As relevant herein, FPC

16  supplied J-M with F622 resin, which was the primary ingredient in J-M's PVC

17  compound for PVC pressure pipe. During the relevant period, J-M purchased up to

18  90 million pounds of resin per month from FPC.

19      100.  J-M frequently reported problems with the quality of FPC resin.  For

20  example, in June 2004, Jeff Hsu informed Walter Wang that: "Since May 19,

21  Formosa resin has been having a quality problem. Starting June 5, we have had a

22  problem again.   The pipe ID became rough and we were forced to slow the

23  machines down 20-30 percent.   Also, it generated 33,070 pounds of scrap.   On

24  Monday, we called Pt. Comfort and had an emergency meeting with them.   We

25  showed the FPC representatives the samples we submitted to R&D as well as the

26  R&D report showing that the resin in abnormal.  The report showed normal fusion

27  torque at 1900 with the questionable resin fusion torque in the 1700 resin.  We will

28  summarize all the scrap due to this resin problem plus total loss of production."

Case 1:11-cv-01691-MSK-MJW   Document 1-1   Filed 06/28/11   USDC Colorado   Page 37 of 50
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 34 of 140   Page ID
#:14424

101.   In order to manufacture PVC pipe, PVC resin must be combined with other ingredients (e.g., waxes, stabilizers, colorants, and other additives) to form a compound that is then extruded into pipe.   At all times relevant hereto, the industry standard formulation for PVC compound was published by the Plastic Pipe Institute ("PPI").

102.   With FPC's knowledge and assistance, J-M used a proprietary, less expensive compound called JM90, rather than manufacturing compound based on the PPI formula.   JM90 compound was J-M's "special range formulation for PVC pressure pipe" and was composed of designated PVC resins, stabilizers, fillers, paraffin wax, multi-wax, polyethylene wax, titanium oxide, impact modifiers, heat stabilizers, and colorant.   Using their own compound allowed FPC and J-M to control the type and quality, and therefore the cost, of ingredients that make up the compound.

103.   J-M and FPC were the only entities that were permitted to make JM90. FPC was responsible for manufacturing pre-mixed JM90 compound and shipping it to J-M plants where it could be formed into pipe. At times during the relevant period, FPC produced 800,000 to 1 million pounds of JM90 compound per day for J-M.

104.   As a cost-saving measure and as explained in more detail in Section V.B. infra, J-M and FPC began to substitute cheaper and lower-quality ingredients in their JM90 compound. Specifically, J-M and FPC replaced two primary classes of ingredients in JM90 – resin and additives (such as wax and stabilizers) – with cheaper, inferior-grade brands. They replaced the more expensive, higher viscosity resin (which had a viscosity rating of 0.92), with a lower-grade resin (which had a viscosity rating of 0.88). FPC was the primary supplier of resin to J-M, and most of the resin at issue was produced by FPC. In addition to supplying the resin, which is a vital ingredient in JM90, FPC regularly mixed and prepared JM90 compound and shipped it to numerous J-M plants where it was used to manufacture J-M PVC pipe.

FOURTH AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

Case 1:11-cv-01691-MSK-MJW   Document 1-1   Filed 06/28/11   USDC Colorado   Page 38 of 50
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 35 of 140   Page ID
#:14425

105.   Both FPC and J-M were aware that the switch in ingredients in the JM90 formula would result in an inferior quality pipe.  FPC knew from meetings and communications with J-M that FPC's resin contributed to the deficiencies in J-M's pipe and would result in an inferior quality pipe.  A memorandum dated May 23, 2002, sent from Fassler in R&D to David Chen ("Chen") (Stockton Plant Manager), K.C. Yang ("Yang") (J-M's Corporate Quality Control Supervisor), Lenor Jang, Angela Yen, and Steven Rios (the "May 23 Memo") detailed a conversation Fassler had with representatives of FPC.  The May 23 Memo explained that FPC wished to change three of the specifications for its F622 resin: lowering the inherent viscosity range from 0.90-0.94 to 0.89-0.93, relaxing the PVC resin contamination count, and modifying the particle size distribution requirements.  The memo also recited FPC's "surprise" that J-M's then-current bulk density range was 0.54 to 0.58 because FPC apparently believed that J-M had agreed to lower the bulk-density range to 0.52 to 0.62 at a meeting between FPC and J-M R&D in early 2000.  However, Fassler's May 23 Memo noted the absence of any documentation in J-M's files concerning any purported bulk-density agreement between J-M and FPC in 2000.

106.   According to the May 23 Memo, Fassler told FPC of potential problems with pipe created with these specifications, including problems with the resin that may result in decreased pipe strength and burning in the production process.  Notwithstanding these perceived problems, in April 2004 J-M "temporarily agreed to 0.52-0.60" for the bulk density range, which was then revised slightly to 0.53-0.58 in June 2004.  With regard to inherent viscosity, notwithstanding Mr. Fassler's expressed concerns, in April 2004 FPC lowered the inherent viscosity range of the resin it was supplying to J-M to 0.89-0.93.  Fassler's memo explained that he told FPC of problems with the pipe that would be created with this new formulation.  Specifically, the memo noted that because the new resin would have a lower inherent viscosity, it could result in pipe having decreased strength.  The

34

Case 1:11-cv-01691-MSK-MJW   Document 1-1   Filed 06/28/11   USDC Colorado   Page 39 of 50
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 36 of 140   Page ID
#:14426

1    memorandum further noted concerns of burning and problematic pipe as a result of

2    the proposed modification to the resin by FPC.  As the memo explained, the

3    subsequent modification of particle size distribution, as a result of the proposed

4    modification to the resin by FPC, also equated with extrusion problems.

5         107.   Further, FPC purchased additives that were not produced to industry or

6    J-M specifications.  Such nonconforming materials were marketed to J-M and FPC

7    (as part of FPC's PVC resin blends sold to J-M) as "off-spec" or "wide-spec"

8    products, available for a reduced cost.  J-M repeatedly utilized such off-spec

9    materials in manufacturing J-M pipe to even further reduce its costs of production.

10   FPC was aware that the materials were not to specification because, among other

11   things, they were expressly described in communications with FPC and J-M as "off-

12   spec" or "wide spec."  J-M and FPC knew that use of such non-conforming

13   materials violates industry standards and J-M manufacturing specifications,

14   resulting in poor-quality and non-conforming pipe.

15        108.   FPC was also aware through several means that the erosion of the

16   quality of J-M pipe caused by FPC's lower viscosity resin and substandard additives

17   did not just make the pipe weaker but also caused the pipe to fail to meet required

18   specifications.  As alleged in paragraphs 70-75 above, Relator specifically told Mr.

19   Torres, FPC's Director of Finance and Risk Management, that J-M was receiving

20   claims for defective pipe because J-M's manufacturing process failed to produce in-

21   spec pipe.

22        109.   FPC also knew that J-M pipe failed to meet specifications because FPC

23   was directly involved in the testing of non-conforming J-M pipe.  In late 2004 or

24   early 2005, J-M Quality Control and R&D personnel informed Relator that FPC had

25   tested J-M pipe when FPC was experiencing problems with its compounds that

26   included Luxco multi-wax.  FPC investigated several batches of multi-wax and

27   found that they did not contain the amount of calcium stearate required by J-M's

28

Case 1:11-cv-01691-MSK-MJW   Document 1-1   Filed 06/28/11   USDC Colorado   Page 40 of 50
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 37 of 140   Page ID
#:14427

1   approved formula. Moreover, the proportion of calcium stearate was highly variable

2   between batches.

3         110.   In addition, FPC witnessed through direct testing that J-M pipe made

4   with Luxco multi-wax had greatly varying physical properties, resulting in non-

5   conforming pipe. As explained infra, this inconsistency, in part, contributed to the

6   hydrostatic design basis ("HDB") failures prominent during the development of the

7   No-Thickened-Section pipe. J-M used Luxco multi-wax for many years.

8         111.   Finally, FPC was also aware that J-M pipe failed to meet specifications

9   because, as alleged in detail above, FPC exercised substantial control over J-M's

10  operations, and FPC employees and officers were involved in key aspects of J-M's

11  business, as also described in detail above.

12  ## V.   FRAUD AGAINST THE REAL PARTIES

13       ### A.   Walter Wang's Leadership

14        112. Under Walter Wang's leadership, J-M implemented a series of cost-

15  cutting measures that undermined the quality of J-M's PVC pipe products.   At

16  Walter Wang's direction, the outgoing former Johns-Manville managers were

17  replaced by individuals with significantly less experience and fewer credentials. For

18  instance, the Director of Production, who formerly had been a senior engineer, was

19  replaced by Barry Lin ("Lin"), an accountant from FPC's management center with

20  no engineering background. The new Director of Engineering, Kaider Liao, did not

21  have an engineering degree.   The new Quality Control Manager, Jack Hwang

22  ("Hwang"), was an electrical engineer with no experience or formal training in

23  failure analysis. After Hwang left the Quality Control Manager post in 2004, the

24  position was later filled in 2005 by a recent college graduate.

25        113.   Backed by this group of inexperienced managers, Walter Wang shifted

26  J-M's focus away from product quality to a single-minded mission of gaining

27  market share and improving the bottom line without regard to quality.

28        114.   Consistent with this cost-cutting governing principle, Walter Wang

FOURTH AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

Case 1:11-cv-01691-MSK-MJW   Document 1-1   Filed 06/28/11   USDC Colorado   Page 41 of 50
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 38 of 140   Page ID
#:14428

1   micro-managed J-M.  For example, resolution of all customer claims valued over

2   $15,000 had to be cleared by him personally, and certain employees' hotel upgrades

3   had to be reviewed by him as well.

4       115.   Under the direction of Walter Wang and his new managers, J-M

5   implemented three cost-cutting measures that seriously compromised the tensile

6   strength of the majority of its PVC pipe.

7       **B.     FPC and J-M Substituted Inferior Ingredients in J-M's PVC**

8       **Compound**

9       116.   As noted previously, as a cost-saving measure, J-M and FPC began to

10  substitute cheaper and lower-quality ingredients in JM90 compound.  Specifically,

11  J-M and FPC replaced two primary classes of ingredients in JM90 – resin and

12  additives (such as wax and stabilizers) – with cheaper, inferior-grade brands.

13      117.   In addition to being cheaper to make and purchase, the use of a lower

14  viscosity resin allowed pipe to be manufactured more quickly and with less

15  processing, thereby allowing J-M to increase its production rates and output.

16      118.   The poor quality of the ingredients used in the JM90 compound,

17  including the resin produced by FPC and lower-grade brands of additives such as

18  waxes and stabilizers, has resulted in the JM90 compound having a decreased

19  overall tensile strength.   This is exemplified by testing conducted by NSF

20  International ("NSF") (formerly known as the National Sanitation Foundation) in

21  2003 at the McNary, Oregon Plant.  As set forth in more detail below, see Section

22  VII, on or about September 25, 2003, NSF required that J-M pipe be subjected to

23  HDB testing for the pipe to maintain its NSF certification.  NSF observed that the

24  Product Sample Form for the 1" pipe being tested showed that it contained FPC

25  resin.  This pipe failed HDB testing with a long-term hydrostatic strength ("LTHS")

26  of 3,608, meaning that it had less than a 20% useful life when compared to pipe that

27  passed HDB testing.

28

FOURTH AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

Case 1:11-cv-01691-MSK-MJW   Document 1-1   Filed 06/28/11   USDC Colorado   Page 42 of 50
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 39 of 140   Page ID
#:14429

119.   The corresponding increase in production rates resulting from the switch to a lower viscosity resin further contributed to pipe made with the JM90 compound having a decreased overall tensile strength.   Because the lower viscosity resin was a more ductile material, it required more processing to achieve the required tensile strength.   Instead of slowing its production rates to account for the lower viscosity resin, J-M increased its production rates to increase its output of PVC pipe.

120.   With regard to the inferior pipe quality that resulted from the switch in ingredients:

a)   Brian Wang, former manager of three plants, has acknowledged that in order to increase profits, J-M management began using cheaper compound ingredients, including wax lubricants, stabilizers, and resin.

b)   Yang has acknowledged that in order to increase profits, Defendants' management ordered the use of compound ingredients from a company called Luxco.   These ingredients were inferior, and shortly after the changeover to Luxco, pipe manufactured by J-M could no longer meet the UL 1285 requirement of 7,000 psi.   Yang has further acknowledged that Defendants' management refused to allow him to pursue the Luxco quality issue.

c)   John Nagode ("Nagode"), former Quality Control Supervisor at the McNary, Oregon Plant, has acknowledged that changes in the quality of the compound being used by J-M caused test failures on a regular basis.   Nagode has acknowledged that the compound ingredients were changed because J-M management did everything on the cheap.

d)   Fassler has acknowledged that in order to reduce the cost of material it used, J-M switched from paraffin wax to multi-wax.   The multi-wax had extreme variations and inconsistencies.   Eventually the company had to switch back because of the serious quality problems with these ingredients.

e)   Fassler has further acknowledged that, in the year 2000, J-M switched to a

FOURTH AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

Case 1:11-cv-01691-MSK-MJW   Document 1-1   Filed 06/28/11   USDC Colorado   Page 43 of 50
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 40 of 140   Page ID
#:14430

lower viscosity resin and that this decision was made by J-M senior management in order to save money. Fassler strongly opposed the change-over because the reduced viscosity reduced tensile strength, but the change was made nonetheless.

f) In a memorandum to Chen created on May 23, 2002, Fassler stated: "Lower IV [inherent viscosity] means lower physical strength (lower tensile strength, lower hoop stress, lower impact resistance). For JM90 the safety factor for tensile strength and hoop stress is already small. For electrical conduit, well casing, and foam core DWV the impact resistance test is already critical. Lower IV resin would decrease the safety factor for these products."

## C. Accelerating Production Rates

121.   In addition to degrading the ingredients that make up its JM90 compound, J-M began to make changes to its manufacturing process that further eroded the tensile strength and caused the finished PVC pipe to be out-of-specification.

122.   PVC pipe is manufactured by extrusion. Broadly described, extrusion involves the following steps. The ingredients that make up the PVC compound (e.g., base resin and additives like paraffin wax and calcium stearate) are weight-measured out of silos and poured into a hopper where they are mixed. The mixed PVC compound is then poured into the extruder, where it is melted and formed by being forced (by a barrel and screw acting as an auger) through an orifice known as the die that creates the shape and dimensions of a pipe. Once out of the extruder and die, the hot PVC pipe is then cooled in a series of water cooling tanks.

123.   To meet an ever-increasing demand for PVC pipe, J-M began to increase production rates in each of its 11 plants that produced PVC pipe. Instead of investing in more extruders, replacing outdated extruders, or building more plants, J-M started running its existing extruders (many of which were over 30 years old) at speeds that exceed the extruders' rated capacity. Each extruder has a recommended

Case 1:11-cv-01691-MSK-MJW  Document 1-1  Filed 06/28/11  USDC Colorado  Page 44 of 50
Case 5:06-cv-00055-GW -PJW  Document 412  Filed 05/24/11  Page 41 of 140  Page ID
#:14431

1  maximum output measured typically in pounds per hour, and J-M began running its

2  extruders at 20 percent above the rated capacity.

3      124.  As a result of the increased speed of J-M's production line, more torque

4  and higher temperatures were needed to melt the JM90 compound and, once melted,

5  the PVC material received less processing time in the extruder and die as it was

6  being formed into pipe.  The temperature of the water being sprayed on the pipe in

7  the cooling baths had to be lowered to counteract both the increased temperature of

8  the pipe emerging from the extruder and the fact that the pipe was spending less

9  time in the cooling baths.  To adjust the temperature of the cooling baths, the

10  number of sprayers was increased or decreased.  (Since the cooling baths occupy a

11  fixed distance on the production line, the increased production rates had the pipe

12  moving more quickly over this and all other parts of the production line.)

13      125.  Not surprisingly, the effect of this accelerated manufacturing process

14  (in addition to increased output) was to further decrease the tensile strength of J-M's

15  PVC pipe.  Like a cake baked for eight minutes at 800 degrees and then quickly

16  cooled in a freezer, the PVC pipe being produced at the accelerated production rate

17  was not as strong as pipe that was afforded proper processing time and conditions.

18  Having been subjected to a quick burst of cooling, the surface of the outside of the

19  pipe was hard, whereas the portion of pipe below the surface, not having had

20  adequate time to cool and form, was soft.  The accelerated manufacturing process

21  also created huge variations in the temperatures of the inside and outside diameter of

22  the pipe and the rate at which each cooled.  The effect of these differential

23  temperatures and cooling rates was to further weaken the pipe and create locked-in

24  stresses in the pipe that increase the likelihood the pipe will catastrophically rupture

25  when it is tapped.

26      126.  With regard to the accelerated production process described above:

27      a)  Brian Wang has acknowledged that Barry Lin and Walter Wang

28      repeatedly increased production quotas in order to maximize profits.  The

40

Case 1:11-cv-01691-MSK-MJW   Document 1-1   Filed 06/28/11   USDC Colorado   Page 45 of 50
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 42 of 140   Page ID
#:14432

increase forced plant managers to speed up the extruders, which put stress on them.

b) Yang has acknowledged that J-M management constantly increased production quotas, causing plants to ramp up the speed at which the extruders were run.

c) Nagode has acknowledged that extruders at J-M's plants were always run at faster than rated capacity, resulting in non-conforming pipe, including non-conforming tensile strength.

d) Fassler has acknowledged that, over time, extrusion goals were increased significantly. This caused plant managers to increase the speed at which the extruders were run. This in turn made it more difficult to keep the manufactured pipe within specification.

**D. Improper Tooling and Maintenance of Extruders**

127. During the relevant time period, with the exception of its newer plants in Adel, Georgia, and Meadville, Pennsylvania, in each of its remaining PVC plants, J-M had many extruders that were over 30 years old. Rather than invest in new extruders, J-M placed a new, high-output die on the end of the older extruders to keep up with the accelerated production schedule set by Walter Wang. However, because J-M's lower-quality PVC compound required more processing time and the older extruders were not able to work the PVC compound enough for the high-output die, the tensile strength of the pipe produced by the combination of older extruder and high-output die was further diminished.

128. In late 2004, J-M began receiving complaints from customers regarding a certain type of PVC pipe (IPS white pipe) produced at its plant in Stockton, California. The combination of increased production rates, higher temperatures, and high-output dies on older extruders had caused the pipe to burn, turning it yellow in color, instead of the white color characteristic of this particular type of pipe. To remedy the problem, Yang instructed the Stockton plant to use a regular die for this

Case 1:11-cv-01691-MSK-MJW   Document 1-1   Filed 06/28/11   USDC Colorado   Page 46 of 50
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 43 of 140   Page ID
#:14433

product.   In an email dated January 4, 2005, Yang instructed Stockton's Superintendent of Production, Jim Reichert, that: "PST [Plant Stockton] should use regular die for IPS white products when high-output die cause burning.   If necessary, PST should request new IPS die." Exhibit 4, incorporated herein.

129.   By increasing its production rates to speeds exceeding the extruders' rated capacity, J-M accelerated the wear on its extruders.   Moving parts like the extruders' screw and barrel were most affected by the added wear.   However, rather than increase the amount of maintenance to account for more wear, J-M abandoned its former practice of regularly monitoring and replacing the screw and barrel unit when it fell below a certain tolerance and decided instead to amortize the unit over a given time period (such as one year) and replace it only at the end of that time period.

130.   J-M managers like Fassler began to observe that, under the increased production rates, the screw and barrel unit was exceeding the old tolerances and needing replacement after only six months.   Nevertheless, under its new amortization policy, J-M continued to use the screw and barrel unit for another six months before it was replaced.   Experienced J-M engineers like Fassler were well aware that the PVC material extruded in the second half of the unit's amortized life with the underperforming screw and barrel unit had reduced tensile strength.   See Exhibit 5 (Relator's notes dated 11/3/05), incorporated herein.

131.   In a discussion with Relator on November 3, 2005, Fassler explained that the reason for the decrease in tensile strength stems from the proximity of the screw and barrel to each other.   For instance, a new screw and barrel unit, which fits closely together, will generate more shear and yield better mechanical properties in the finished pipe.   See Exhibit 5.   However, as the unit wears, the fit loosens and the shear decreases, which compromises the processing and decreases the tensile strength of the PVC material.   Id.   Despite this knowledge, J-M failed to replace its underperforming screw and barrel units after the first six months of use and allowed

42

Case 1:11-cv-01691-MSK-MJW   Document 1-1   Filed 06/28/11   USDC Colorado   Page 47 of 50
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 44 of 140   Page ID
#:14434

1    them to be used for an additional six months in spite of the detrimental effect on the

2    pipe's tensile strength.

3      132. The combined effect of J-M's substitution of inferior ingredients,

4    increased production rates, and improper tooling and maintenance of its extruders

5    caused J-M to produce PVC pipe that failed to meet the tensile strength

6    requirements set forth by UL, the American Water Works Association ("AWWA"),

7    ASTM International ("ASTM") (originally known as the American Society for

8    Testing and Materials), and FM Approvals, a division of FM Global (formerly

9    Factory Mutual) ("FM").

10      133. With regard to the improper tooling and extruder issue:

11      a) Brian Wang has acknowledged that the increased speed of the extruders

12      caused the screw and barrel units to wear out faster, but maintenance and

13      replacement schedules were not modified to take increased wear and tear into

14      account.

15      b) Yang has acknowledged that J-M's screw and barrel units were constantly

16      wearing out because of the high extruder speeds, and J-M did not replace

17      them often enough. This contributed significantly to producing non-

18      conforming pipe. Yang further acknowledged that J-M far exceeded the

19      screw and barrel life expectancy, and J-M management would not allow

20      replacement often enough.

21      c) Fassler has acknowledged that the screw and barrel units were replaced

22      according to an amortization schedule. This was an improper approach and

23      led to the use of worn screw and barrel units. In fact, J-M far exceeded the

24      life expectancy of the units; J-M management overruled plant managers who

25      tried to replace the units.

26   **VI.**    **J-M SELLS SUBSTANDARD PVC PIPE BEARING UL MARK**

27      **DESPITE KNOWLEDGE THAT THE PIPE DOES NOT QUALIFY**

28      **FOR UL LISTING**

FOURTH AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

Case 1:11-cv-01691-MSK-MJW   Document 1-1   Filed 06/28/11   USDC Colorado   Page 48 of 50
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 45 of 140   Page ID
#:14435

## A.   J-M PVC Pipe Does Not Meet UL's Longitudinal Tensile Strength Requirement

134.   UL is a not-for-profit corporation that tests and certifies a wide range of products for public safety.  Once a product is tested and found to conform to UL's safety requirements, that product becomes UL-certified and is eligible to bear the UL Mark.  A product bearing a UL Mark is universally accepted as being safe.

135.   UL has promulgated a safety standard governing PVC pipe for use in underground fire service systems.  UL 1285 lists a variety of requirements that must be met for PVC pipe to be UL-certified and bear the UL Mark.  Specifically, UL 1285 requires that "[r]epresentative samples of each class, pressure rating and size of PVC pipe . . . shall be subjected to the tests described in Sections 11 – 20."  Exhibit 6, incorporated herein.  One of those tests, Section 17, is the Longitudinal Tensile Strength ("LTS") Test, which provides that "[m]achined specimens from the pipe shall have a minimum tensile strength of 7,000 psi."  Id.

136.   J-M has undergone only two rounds of LTS Tests for UL on its PVC pipe products.  The first round was on its founding in 1982 when J-M had to initially qualify its PVC pipe products for UL listing.  The second round was in the mid-1990s when J-M sought to change its PVC pipe compound and begin making pipe out of its newly created JM90 compound.  J-M passed both of these tests and received UL listing for its PVC pipe products.

137.   Once it has certified a product, UL does not require that the product undergo the Performance Tests listed in Sections 11 through 20 of UL 1285, including the LTS Test, unless and until there has been a material change in the product's materials, design, or processing.  While UL requires manufacturers to "conduct the necessary production control, inspection, and tests" as they produce the pipe, these routine Manufacturing Tests are much less stringent than the Performance Tests UL 1285 requires to initially qualify the PVC pipe.  Exhibit 6.

138.   UL operates on an honor system.  Once a product is UL-listed, UL

44

Case 1:11-cv-01691-MSK-MJW Document 1-1 Filed 06/28/11 USDC Colorado Page 49 of 50
Case 5:06-cv-00055-GW -PJW Document 412 Filed 05/24/11 Page 46 of 140 Page ID
#:14436

1 relies on manufacturers to notify it of any material changes to the product's
2 materials, design, or processing. By requiring "*representative* samples of each type
3 of PVC pipe" for qualification testing, UL conditions its ongoing certification of the
4 product on the understanding that all future pipe will be made in a manner that is not
5 materially different from the samples submitted to UL to qualify the pipe. Exhibit 6
6 (emphasis added). In the Foreword, UL 1285 specifically states that "[t]he
7 observance of the requirements of this Standard by a manufacturer is one of the
8 conditions of the continued coverage of the manufacturer's product." Id.

9     139. By at least 1991, J-M's cost-cutting practices of substituting inferior
10 ingredients in its compound, accelerating production rates, and improperly tooling
11 its extruders were well-established and had seriously degraded the tensile strength of
12 J-M's PVC pipe. By this time, J-M had begun to receive LTS Test results (from J-
13 M's internal testing and testing performed by customers in connection with claims
14 for failing pipe) showing that more than 50 percent of the time J-M's PVC pipe
15 failed to meet the minimum LTS requirements set forth in UL 1285.

16     **1.  Results of Internal LTS Testing Trouble Relator**

17     140. Fassler ordered all of the LTS Tests that J-M requested from 1996
18 through 2005. Based on his review of these test results, Fassler estimated that J-M's
19 PVC pipe failed LTS requirements 70 percent of the time.

20     141. In 2002, while working on two large claims against J-M for failed PVC
21 pipe, Relator was asked to review the results of all internal LTS Tests J-M had
22 performed on PVC pipe manufactured between 1998 and 1999, the time period
23 when the failed pipe was produced. In so doing, Relator was able to review the
24 results from six LTS Tests that had been performed on J-M's PVC pipe. Of the six
25 tests, Relator observed that four failed the LTS requirements and only two passed.

26     142. At various times, together and separately, Fassler, Yang, and Relator
27 each have expressed concern to Lin about the large percentage of failing LTS Test
28 results on J-M's PVC pipe. Lin has responded by saying that the failures were "an

FOURTH AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

Case 1:11-cv-01691-MSK-MJW  Document 1-1  Filed 06/28/11  USDC Colorado  Page 50 of 50
Case 5:06-cv-00055-GW -PJW  Document 412  Filed 05/24/11  Page 47 of 140  Page ID
#:14437

1  acceptable risk to meet company goals," failures were normal, and not every piece

2  of pipe would always meet specification. Exhibit 7 (Relator's notes dated 9/12/05),

3  incorporated herein.

4      143.   After seeing a subset of the results of J-M's LTS testing in which 60

5  percent of the samples failed and after learning from Fassler that the collective

6  results of the past nine years showed an overall failure rate of 70 percent, Relator

7  was no longer comfortable signing his name to customer certifications and letters to

8  claimants representing that J-M's pipe complied with the UL Standard.  On August

9  23, 2005, Relator told Lin about his concerns and said he would not sign any more

10  letters without first seeing copies of all of the results of J-M's LTS testing.

11      144.   Lin refused to provide Relator with the LTS Test results.  Instead, he

12  simply assured Relator that J-M's UL-listed products met all the requirements of UL

13  and directed him to continue to certify this to J-M's customers.   Exhibit 8,

14  incorporated herein, is a copy of Relator's August 25, 2005, email to Lin asking him

15  to acknowledge in writing his statements regarding J-M's compliance with the UL

16  tensile strength requirement despite internal test results to the contrary.   After

17  having similar conversations with Yang, Kai Cheng ("Cheng"), J-M's Director of

18  Product Assurance, and Mai Huynh, J-M's Product Assurance Manager, Relator

19  sent similar emails to each of them. See id.  None of the recipients provided a

20  written acknowledgment to Relator.

21      **2.    Results of Testing Performed in Conjunction with Claims Against**

22          **J-M**

23      145.   By at least 1991, J-M had received test results showing failing

24  longitudinal tensile strength from its Product Assurance Department.  J-M's Product

25  Assurance Department handles all claims and complaints brought by J-M customers

26  for failing pipe.   Because LTS testing can be performed only by a certified

27  independent laboratory and is expensive ($2,500 per specimen for the series of tests

28  with which this test is packaged), it is typically requested only in the case of larger

46