# EXHIBIT A
## Declaration of Stuart Rennert
## (Part 2)

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 2 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 48 of 140   Page ID
#:14438

claims involving significant damages.

146.   During Relator's three years in J-M's Product Assurance Department, LTS testing was performed in connection with only 14 of the claims.   Of those 14 claims, Relator saw 12 instances in which the longitudinal tensile strength of J-M's PVC pipe was below the 7,000 psi minimum requirement and only two instances in which the PVC pipe met LTS requirements.   By contrast, LTS testing of pipe manufactured by J-M's predecessor, Johns-Manville, ranged from 7,560 – 8,765 psi and always exceeded the desired level of 7,150 psi.   Exhibit 9, incorporated herein, contains copies of some of the test results documenting the following failing longitudinal tensile strengths measured in pipe from four of the 14 claims:

| Number & Name of Claim | Longitudinal Tensile Strength Required by UL 1285 | Longitudinal Tensile Strength Measured in Sample of J-M PVC Pipe | Independent Laboratory That Performed the Test | Test Date |
|---|---|---|---|---|
| Q00-H-41 Ferguson Cities Supply Brigman Construction | 7,000 psi | Hobbs B:  6,600 psi | Law Engineering and Environmental Services, Inc. | 09/28/00 |
| Q00-H-14 Tec Utilities | 7,000 psi | Sample 2:  6,680 psi Sample 3:  6,750 psi Sample 4:  6,940 psi | Modern Industries, Inc. | 10/31/00 |
| Q02-J-40 Westgate Resorts | 7,000 psi | 6,833 psi | Bodycote Broutman, Inc. | 10/01/02 |
| Q05-C-08 Sheldon | 7,000 psi | Sample 1:  6,777 psi Sample 2:  6,775 psi | CRT Laboratories | 6/9/05 |

147.   In his Internal Recommendation and/or Authorization ("IRA") advising J-M on how it should handle the Sheldon claim referenced in the chart above,

47

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 3 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 49 of 140   Page ID
#:14439

1 Relator noted that: "CRT conducted testing on the pipe and found that the tensile
2 strength of the pipe was below that required by the UL Listing Mark on the pipe on
3 all samples tested." Exhibit 10, incorporated herein. Because of the pipe's
4 substandard longitudinal tensile strength, Relator recommended that J-M offer the
5 customer a settlement of $30,000. Id.

6     148. Cheng disagreed with Relator's recommendation and instructed Relator
7 to "find a way to deny the claim and follow his thoughts, that J-M is not responsible
8 even if we fail the test, and offer alternative theories as to the cause of failure for
9 this case." Exhibit 11 (Relator's notes dated 11/1/05), incorporated herein. In his
10 conversation with Relator, Cheng also stated that he "knew that probably half of our
11 pipe did not meet this requirement of UL [UL 1285 longitudinal tensile strength]
12 and for all of our pipe to meet the standard we would have to be perfect in
13 production and we could not always do that." Id.

14     **3.**    **Results of Internal LTS Testing of J-M's 30" and 36" Big Blue Pipe**

15     149. Beginning in approximately 1999 with the opening of its new plant in
16 Adel, Georgia, J-M added two new products to its Big Blue PVC pipe product line.
17 J-M began manufacturing Big Blue PVC pipe with a pressure rating of 165 psi in
18 both the 30" and 36" sizes in its Adel, Georgia and Fontana, California plants.
19 Shortly after starting to manufacture these two products, J-M sent specimens from
20 both pipes to an outside laboratory for LTS testing to see if they could qualify for
21 UL listing. However, all of the specimens failed to meet the minimum longitudinal
22 tensile strength of 7,000 psi required by UL 1285.

23     150. Once it established a customer base for these two products, J-M
24 introduced a second pressure class – one with a pressure rating of 125 psi – in both
25 its 30" and 36" Big Blue PVC pipe. Again, J-M subjected samples from these two
26 new products to LTS testing at an outside laboratory, and all of the samples had
27 tensile strengths below 7,000 psi. Thereafter, J-M continued to test the LTS of its
28 30" and 36" Big Blue PVC pipe and received failing results. Without a passing

FOURTH AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 4 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 50 of 140   Page ID
#:14440

1  result, J-M was unable to approach UL about qualifying these products, and they did

2  not have a UL Mark until after the acquisition of PW Eagle.

3      151.  Since J-M's 30" and 36" Big Blue PVC pipe is made using the same

4  materials, equipment, and processing as all of J-M's UL-listed Big Blue and Blue

5  Brute pipe, the substandard longitudinal tensile strengths reported on the 30" and

6  36" Big Blue pipes are representative of the longitudinal tensile strengths of all J-M

7  UL-listed pipe.  Like the results of other J-M internal LTS testing and its claims

8  testing, the failing results for its 30" and 36" Big Blue pipe are further proof that

9  J-M's cost-cutting measures of substituting inferior ingredients in its JM90

10  compound, accelerating its production rates, and improperly tooling its extruders

11  reduced the longitudinal tensile strength of its PVC pipe.

12      **B.**   **J-M PVC Pipe Does Not Meet UL's Radial Tensile Strength**

13             **Requirement, as Demonstrated by the "No Thickened Section"**

14             **Project**

15      152.  In August 2003, Relator proposed a change to the bell design of J-M's

16  Blue Brute and Big Blue PVC pipe.  The two ends on a length of PVC pipe are

17  called alternately the barrel end and the bell end.  Under J-M's existing design, the

18  bell end had a greater wall thickness than the remainder of the pipe.  To make the

19  bell walls, the extruder had to be slowed down and additional material added to

20  increase the wall thickness.  Under Relator's proposal, dubbed the "No Thickened

21  Section" Project, the bell wall would not be thickened and would have the same

22  dimensions as the remainder of the pipe, thereby allowing the extruder to run at a

23  nearly continuous speed, increasing output and reducing the amount of material

24  needed per length of pipe.

25      153.  Relator found support for his proposed design change in the AWWA

26  standards governing PVC Pipe for Water Transmission and Distribution, AWWA

27  C900 and C905.  Under Section 4.3.2.2 of both AWWA C900 and C905, the pipe's

28  bell end must meet one of two requirements.  It must have the same wall thickness

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 5 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 51 of 140   Page ID
#:14441

1    ratio as the barrel of the pipe, or it must be tested to ensure that the joint assembly

2    qualifies for a HDB category of 4,000 psi.  See Exhibit 12, incorporated herein.

3    Whereas longitudinal tensile strength testing measures the tensile strength of the

4    lengthwise portion of the pipe from end to end, HDB testing is one of several ways

5    of measuring the tensile strength of the radial, circular, or hoop section of the pipe.

6    Based on this Section, Relator concluded that the thickened bell could be omitted

7    from the pipe design so long as a joint manufactured from the thinner bell could

8    meet the required HDB category of 4,000 psi.

9        154.  In his Project Initiation Form dated October 28, 2003, Relator

10   estimated that by omitting the thickened bell section of its two most popular

11   products, Blue Brute and Big Blue, J-M would save $3,000,000 a year in materials

12   costs alone, not to mention the additional efficiencies to be gained from not having

13   to slow down its extruders and running them at a continuous speed.  See Exhibit 13,

14   incorporated herein.   Other managers, including Fassler, extolled the potential

15   benefits of a "No Thickened Section" pipe.  In an email to Hwang dated September

16   3, 2003, Fassler wrote: "The potential benefits are large: significantly reduced

17   material usage; greatly reduced bell-end forming scrap; easier bell-end forming;

18   better bell-end appearance."   Exhibit 14, incorporated herein.   On December 8,

19   2003, Walter Wang approved the "No Thickened Section" Project with a budget of

20   $65,000 to cover the costs of designing and developing the new bell end and

21   performing the various tests needed to gain UL listing.  See Exhibit 13.

22       155.  Since the thinner bell wall involved only a change in the pipe's design,

23   as opposed to its materials or processing, J-M did not have to undergo many of the

24   Performance Tests in UL 1285, including the LTS Test, to qualify the newly

25   designed pipe for UL listing.  Instead, to qualify the new design, UL required J-M to

26   pass the following three strength tests, each of which measures the radial tensile

27   strength of the newly designed bell end of the pipe: (1) a shortened HDB Test (2,000

28   hour test); (2) Sustained Pressure Test (1,000 hour test); and (3) Quick Burst Test

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 6 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 52 of 140   Page ID
#:14442

1   (60 second test).

2   156.   Since the newly designed, no-thickened-section pipe was made from
3   the same materials and process as the existing thickened-section pipe, J-M
4   experienced many of the same problems with the new pipe as it had with the
5   existing pipe.   For instance, J-M's three cost-cutting practices (substitution of
6   inferior materials, accelerated production rates, and improper maintenance and
7   tooling of its extruders), which caused J-M's existing pipe to fail the LTS Tests a
8   majority of the time, also caused J-M to fail many of the above-referenced radial
9   strength tests on the newly designed, no-thickened-section pipe.

10   157.   In January 2006, after beginning production on no-thickened-section
11   pipe, J-M tested at least one sample of current production pipe (4" Dimension Ratio
12   ["DR"] 18 and 4" DR 25 pipe) from all of its plants.   The results ranged from 6,670
13   – 7,060 psi for the DR 18 pipe and 6,660 – 6,680 psi for the DR 25 pipe.   Fassler
14   concluded that: "The apparent longitudinal tensile strength of four-inch DR 18 &
15   DR 25 pipe at all facilities is below the desired level of 7,150 psi."   In July 2006, J-
16   M tested three runs of its 4" DR 25 pipe from Fontana.   Each of the three runs failed
17   LTS, with results ranging between 6,550 psi and 6,680 psi.

18   158.   These failures, arising from the degrading of the manufacturing
19   materials process, have resulted in a vastly different product than that manufactured
20   by J-M's predecessor company, Johns-Manville.   In 1974, LTS testing of Johns-
21   Manville's pipe ranged from 7,560 – 8,765 psi and always exceeded the desired
22   level of 7,150 psi.   By contrast, tests by J-M show results ranging from 6,349 –
23   7,060, nearly always below the desired level.

24   159.   To gain UL listing for the new pipe design in the face of such failures,
25   J-M resorted to a number of fraudulent practices, including without limitation:

26      (1) specially producing the UL specimens using higher quality ingredients
27      and reduced production rates that are not representative of J-M's actual
28      materials and process, including:

51

Case 1:11-cv-01691-MSK-MJW  Document 1-2  Filed 06/28/11  USDC Colorado  Page 7 of 52
Case 5:06-cv-00055-GW -PJW  Document 412  Filed 05/24/11  Page 53 of 140  Page ID
#:14443

(a) changes to the extrusion process, such as: (i) increasing the shear/torque on the extruder to work the compound more thoroughly, (ii) slowing down the extruder speeds, and (iii) replacing used screw and barrel units with new ones;

(b) changes to specimen preparation, including: (i) changing the directional cut from tangential to radial, and (ii) changing the dimensions to equal the thickness of the pipe wall; and

(c) changes to compound, including: (i) using JM90R compound instead of JM90, (ii) eliminating the use of Luxco brand multi-wax, and (iii) using single-batch compounding instead of double-batch;

(2) concealing failing test results from UL;

(3) where early results indicated a specimen ultimately would fail, stopping long-term tests before they were completed and substituting new specimens; and

(4) making multiple specimens from one lot, and testing a subset of the specimens in advance to ensure that when the remaining specimens were tested for UL, they would pass the tests.

**1. HDB Testing**

160. As discussed above, the two AWWA standards governing PVC pressure pipe – AWWA C900 and AWWA C905 – both state at Section 4.3.2.2(b) that the joint assemblies of the pipe's bell must "qualify for a hydrostatic design basis (HDB) category of 4,000 psi (2,758 MPa) when tested in accordance with ASTM D2837 as modified in ASTM D3139." Exhibit 12. ASTM D2837, in turn, provides the test method for obtaining the pipe's HDB. See Exhibit 15, incorporated herein.

161. The purpose of HDB testing is to determine the long-term radial strength characteristics of PVC pipe. Broadly described, HDB testing is performed by placing 10 specimens under varying degrees of pressure and recording the point

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 8 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 54 of 140   Page ID
#:14444

1   in time, up to a maximum of 2,000 hours, when the joint fails. In a November 14,

2   2003 email to Hwang, Fassler described the HDB test as "the most stringent test of

3   PVC pressure pipe quality." Exhibit 16, incorporated herein. Because HDB testing

4   lasts 83.3 days and requires special equipment, it must be performed at an

5   independent, certified testing laboratory. Given the length of the test, UL does not

6   require that a UL representative be present to observe the testing.

7        162.   Once the testing is complete, Section 5.4 of ASTM D2837 requires that

8   the following three calculations be performed to determine a pipe's HDB: (1) the

9   hydrostatic strength at 100,000 hours; (2) the hydrostatic strength at 50 years; and

10  (3) the percent of circumferential expansion. Each of these calculations measures

11  the pipe's long-term hydrostatic strength. To obtain an HDB category of 4,000 psi,

12  the smallest of these three values must have a long-term hydrostatic strength

13  between 3,830 and 4,800 psi. Exhibit 15 (at Table 1). However, in Note 7, ASTM

14  D2837 notes that the expansion measurement is not required in North America

15  because expansion strengths taken from North American stress-rated PVC materials

16  have not been found to be "the limiting factor," i.e., the lowest of the three values

17  described above.

18        163.   From the beginning of the "No Thickened Section" Project, many of J-

19  M's Quality Control managers expressed concern about the ability of J-M's pipe,

20  thickened or not, to pass the required HDB category of 4,000 psi. In a November

21  14, 2003 email to Hwang, among the challenges J-M needed to overcome for the

22  Project to succeed, Fassler listed first J-M's "[i]ncreasing failure rates in long-term

23  pressure tests." Exhibit 16. Fassler also cited three other obstacles: (1) the recent

24  failure of J-M's pipe to pass Sustained Pressure Tests at NSF, which provides

25  product testing and certification services for products in contact with potable water,

26  (2) failing HDB testing, and (3) numerous joint specimen failures "where the pipe

27  burst before the joint leaked." Id.

28        164.   Given its history of problems with the tensile strength of its PVC pipe,

FOURTH AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 9 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 55 of 140   Page ID
#:14445

1    J-M was dubious that no-thickened-section pipe produced at random on the same

2    machinery using the same materials and process as its existing pipe would pass the

3    HDB testing.  To increase its odds of passing, J-M directed the Plant Managers

4    preparing the no-thickened-section specimens to monitor the results of the daily

5    Quick Burst Tests being performed on its existing pipe and only produce the

6    specimens when those results were favorable.

7         165.  In a December 9, 2003 email, Fassler, who was heading up specimen

8    preparation for the Project, informed Stephen Yang, the Plant Manager at J-M's

9    Fontana, California plant, that the Quick Burst Test data "is very useful in

10   identifying pipe that has an elevated chance of failing HDB."  Exhibit 17,

11   incorporated herein.  Fassler instructed Stephen Yang to consult that data in

12   choosing when to produce the specimens.  Id.  ("We need to test the pipe before

13   testing the joint because the pipe will limit the strength of the joint.")  Similarly, in

14   another email of the same date, Hwang notified Stephen Yang that: "We have to

15   have a good test result within J-M before we send out for HDB test."  Id.

16        166.  Once the initial specimens were produced (using the Quick Burst data

17   to increase its odds of passing HDB), J-M sent specimens of its no-thickened-

18   section Blue Brute pipe (in size 4" DR 18) to Charles Stanley, the Director of

19   Universal Laboratory in Garland, Texas, for preliminary testing.  Before incurring

20   the cost of 2,000 hours of testing as required by full-scale HDB testing, J-M

21   instructed Mr. Stanley to first subject 10 specimens to a shortened HDB test of only

22   100 hours to give J-M a preview of how the pipe would likely perform.

23        167.  The results of this testing, which J-M managers dubbed "Accelerated

24   HDB Testing," were mixed.   Approximately half of the 10 specimens had

25   hydrostatic strengths that were well below the confidence limit and caused the entire

26   lot to fail the HDB test.  Exhibit 18, incorporated herein, is a copy of the notes

27   Relator took as Mr. Stanley reported on the results of the HDB testing.  Under item

28   number three, Relator notes that the Blue Brute specimen in size 4" DR 18 failed the

FOURTH AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 10 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 56 of 140   Page ID
#:14446

1  confidence limit under the Accelerated HDB testing.  Id.

2      168.  Notwithstanding these results, J-M instructed Mr. Stanley to begin the
3  full-scale HDB testing.  Early in the testing, J-M began to receive reports from Mr.
4  Stanley that many of the specimens were exhibiting excessive swelling.  While
5  ASTM D2837 allows specimens to expand a maximum of five percent during HDB
6  testing, several of J-M's specimens had swelled by as much as 33 percent.  Having
7  never seen such swelling before, Mr. Stanley sent several of the swollen specimens
8  to Fassler and Relator for their review.  (At the time Relator left J-M in November
9  2005, one of the swollen pipe specimens – a Blue Brute pipe in size 4" DR 18 – was
10 still in J-M's literature room.)

11     169.  Despite the fact that these specimens clearly showed a serious problem
12 with excessive swelling, J-M continued to rely on Note 7 of ASTM D2837 (which
13 provides that the expansion measurement is not required where the five percent
14 expansion strengths are not the limiting factor) and refused to consider the
15 expansion measurement in determining HDB.  From the degree of swelling, J-M
16 was aware that if Universal Laboratory had calculated it, the expansion
17 measurement would have been the lowest value of the three calculations for
18 determining long-term hydrostatic strength and would have caused the pipe to fail
19 HDB.  Instead, J-M continued to take only the lower of the first two calculations
20 (hydrostatic strength at 100,000 hours and hydrostatic strength at 50 years) when
21 calculating HDB.

22     170.  Even with the advantage gained by omitting the expansion
23 measurement, J-M repeatedly failed the HDB test when using the lower of the
24 hydrostatic strength at 100,000 hours and at 50 years.  Relator recalls four instances
25 in which Blue Brute specimens failed HDB testing.  Of the four sets of failing
26 specimens, two were in size 8" DR 18, one was 4" DR 18, and one was 8" DR 14.
27 See Exhibit 18.  J-M had no reports documenting the failing results because it had
28 instructed Mr. Stanley to prepare reports only for the passing results and to report

Case 1:11-cv-01691-MSK-MJW    Document 1-2    Filed 06/28/11    USDC Colorado    Page 11 of 52
Case 5:06-cv-00055-GW -PJW    Document 412    Filed 05/24/11    Page 57 of 140    Page ID
#:14447

1    the failing results orally.  Relator recorded many of these failing results on a piece of

2    paper as Mr. Stanley reported them to him.  Id.

3         171.  As discussed above, per ASTM D2837 (as modified by ASTM D3139),

4    HDB testing is performed using 10 specimens that are subjected to varying

5    pressures for varying lengths of time up to 2,000 hours.  During its HDB testing at

6    Universal Laboratory, J-M asked Mr. Stanley to notify it when early indications

7    revealed that one or more of the 10 specimens, if tested to completion, would cause

8    the overall HDB test to fail.  In such instances, J-M instructed Mr. Stanley to stop

9    the testing of those particular specimens (in order to avoid getting any bad data

10   points) and substitute in a new specimen for the continuation of the HDB testing.

11        172.  If the substitutions were unable to produce a passing result and the 10

12   specimens produced a failing HDB, J-M instructed its managers at the plants

13   preparing the specimens to destroy all other specimens made from the failing lot.

14   As was the case with the initial set of specimens, J-M had its Quality Control staff,

15   including Fassler and Armondo Martinez ("Martinez"), Quality Control Supervisor

16   at the Fontana, California Plant, oversee the production of additional specimens.  To

17   increase the odds of getting a passing result, J-M slowed its regular production rates

18   and adjusted its typical temperatures and torque to allow for optimum processing of

19   the specimens.  To reduce the excessive swelling, J-M replaced the lower grade

20   multiwax ordinarily used in its JM90 compound with a high-quality calcium

21   stearate.

22        173.  On July 5, 2004, after seven months of testing, J-M got its first passing

23   result for HDB with tests performed on Blue Brute specimens in size 8" DR 18.

24   However, one month later on August 31, Fassler wrote an email to Relator stating

25   that: "The HDB testing so far has revealed material issues (excessive swelling) and

26   workmanship issues (mid-wall void).  The chances of two consecutive samplings

27   passing HDB appear to be less than 50%."  Exhibit 19, incorporated herein.  As of

28   August 2004, seven of eight samplings of no-thickened-section pipe had failed HDB

FOURTH AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 12 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 58 of 140   Page ID
#:14448

testing. There were at least two more failures between December 2004 and December 2005. According to Fassler, the pipe failed testing seven times in a row and passed on the eighth try only due to luck of the draw. Eight months later, in an IRA recommending that J-M proceed with the production of no-thickened-section pipe, Fassler summarized the HDB testing as follows: "J-M submitted DR 14 & DR 18 joint samplings to Universal Laboratory for HDB tests per ASTM D3139-98. Some early samplings failed. Later submittals passed – confirming that with suitable materials and workmanship the design meets the requirements." Exhibit 20, incorporated herein.

174. By January 2005, after many intermittent failures, J-M had achieved passing HDB results in all three pipe sizes that UL required for its qualification of the new pipe design. J-M provided the passing results to UL. In so doing, however, J-M concealed from UL the following material facts: (1) J-M had conducted other HDB tests on each of these pipe sizes, all of which had failed; and (2) to achieve the passing results, J-M had consulted Quick Burst Test results in deciding when to produce the specimens, altered its regular materials and process, and prematurely stopped testing of specimens that would have produced failing results and substituted new specimens in their place.

### 2. Sustained Pressure Test

175. Another test that measures the long-term radial tensile strength of PVC pipe is the "Sustained Pressure Test" or "1,000 Hour Test." Unlike HDB testing, which measures 10 specimens at varying pressures for varying lengths of time up to 2,000 hours, the Sustained Pressure Test measures five specimens at the same test pressure for 1,000 hours. To pass, the specimens must not "rupture, permanently distort, or weep" when subjected to the specified pressure for 1,000 hours. Exhibit 6. This test is far less onerous than the HDB test and provides little to no information about the radial tensile strength of the product being tested.

176. As described above, Sustained Pressure Testing is one of the three

FOURTH AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 13 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 59 of 140   Page ID
#:14449

strength tests UL required J-M to perform to qualify its no-thickened-section pipe for UL listing. The requirements for Sustained Pressure Testing appear in Section 18 of UL 1285. Like LTS Testing, Sustained Pressure Testing is one of UL's Performance Tests and UL requires that the specimens tested must be representative of the manufacturer's materials, design, and processing. Like HDB Testing, Sustained Pressure Testing requires special equipment and is typically performed by an independent, certified laboratory.

177. In outlining its requirements for qualifying the no-thickened-section pipe, UL informed J-M that it would observe J-M's Sustained Pressure Testing. Because of the length of the test, which lasts 1,000 hours/41.6 days, UL only required a UL observer to be present at the beginning, middle, and end of the testing.

178. Because UL would be observing portions of the Sustained Pressure Tests, J-M wanted to ensure that the specimens it sent Charles Stanley at Universal Laboratory for testing would actually pass the test. To accomplish this, J-M made multiple specimens from each 20-foot section of no-thickened-section pipe it specially produced. J-M subjected the first 10 specimens from each lot to the HDB testing described above. If the specimens produced a passing HDB result, J-M would then send other specimens from that same lot to Universal Laboratory for the Sustained Pressure Testing. Since the specimens had passed HDB testing, which is the most demanding test of pipe quality, J-M could be confident that other specimens from that lot would also pass the less onerous Sustained Pressure Testing.

179. Once it had passed HDB Testing for a particular size of non-thickened-section pipe, J-M sent to Universal Laboratory for Sustained Pressure Testing additional specimens from the same lot as the passing HDB specimens. In that way, J-M was able to pass all of the Sustained Pressure Tests witnessed by UL observers for the two pipe sizes UL required – Blue Brute 4" DR 14 and 4" DR 18.

180. At no time during the course of these Sustained Pressure Tests did J-M

58

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 14 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 60 of 140   Page ID
#:14450

1   disclose to the UL observer that J-M had specially produced each of the test

2   specimens using materials and processing that were not representative of J-M's

3   actual manufacturing process.  J-M also concealed from UL the fact that the test

4   specimens had not been chosen at random but instead were selected from lots that

5   had produced passing HDB test results.

6   ### 3. Quick Burst Test

7   181.  The third and final strength test that UL required for J-M to qualify its

8   no-thickened-section pipe was the Quick Burst Test.  The Quick Burst Test is

9   designed to measure the short-term radial strength characteristics of the pipe.  The

10  requirements for the Quick Burst Test are contained in Section 4.3.3.2 of the

11  AWWA C900 Standard.  Broadly described, Section 4.3.3.2 provides that a pipe

12  specimen must be able to attain a hydrostatic stress of 6,400 psi within 60 to 70

13  seconds of being pressurized.  See Exhibit 12.

14  182.  The Quick Burst Test is a routine quality control test that J-M is

15  required to perform daily at each of its plants at the start-up of the extruder, every

16  eight hours, and following any change in operating conditions.  Given the frequency

17  with which this test is required to be performed, J-M has test equipment in each of

18  its plants and performs the tests itself.

19  183.  In outlining the requirements needed to qualify J-M's no-thickened-

20  section pipe, UL informed J-M that it would come to J-M's plant to observe each of

21  the Quick Burst Tests on the various sizes of its Blue Brute DR 14 and DR 18 no-

22  thickened-section pipe.  Because a UL representative would be observing the tests,

23  J-M again took steps to try and ensure that the specimens would pass while UL was

24  watching.

25  184.  Because the Quick Burst Tests were the last of the three strength tests

26  required for UL listing, at the time it performed the Quick Burst Tests, J-M had

27  already received passing results in both the HDB and Sustained Pressure Testing.  In

28  choosing specimens for the Quick Burst Testing, J-M selected specimens from the

59

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 15 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 61 of 140   Page ID
#:14451

1    same lots as the specimens that had produced the passing results on the HDB and

2    Sustained Pressure Tests.

3        185.   For added insurance, J-M also ran some internal Quick Burst Tests on a

4    few of the specimens from the selected lots to be doubly certain that the specimens

5    would pass while UL watched.   J-M admitted pre-screening for 7,200+ psi Quick

6    Burst results, despite having lowered its internal requirement to 6,400 psi for normal

7    production pipe.   There was extensive R&D involvement in preparing the sample

8    pipe for these preliminary tests.   Moreover, J-M manipulated the testing by

9    replacing test specimens, terminating failing tests early, and stockpiling pre-

10   screened lots.  Using this approach, J-M eventually passed the Quick Burst Tests for

11   all but one of the sizes of its Blue Brute DR 14 and DR 18 no-thickened-section

12   pipe.   In the case of the Blue Brute specimens in size 12" DR 14, however, J-M

13   failed four consecutive Quick Burst Tests while UL observed before ultimately

14   getting a passing result.  On October 26, 2005, Fassler told Relator that J-M had

15   obtained the passing result only by using a thickened-, instead of a no-thickened-,

16   section pipe.   See Exhibit 21, incorporated herein.  According to Fassler, the pipe

17   was measured "while UL wasn't really paying attention and the test pressure

18   calc[ulation] wasn't properly computed on the accurate measurements."  Id.

19       186.   In short, J-M gained UL listing for the new design in size 12" DR 14

20   using a specimen from the old design.  For the HDB testing of no-thickened-section

21   pipe (18 total tests), the passing rate of the test samples was no greater than 64% and

22   more accurately 50% at best.  UL did not see results for all sizes, but only three JM-

23   selected passing results.  J-M did not conduct quality testing or investigation in light

24   of the high number of failures.  It took six months for J-M to obtain passing Quick

25   Burst results on all of its no-thickened-section pipe.  Of 19 total tests witnessed by

26   UL, J-M failed nine (at the 6,400 psi AWWA requirement).  Against J-M R&D

27   personnel recommendations, Walter Wang ordered all plants to produce no-

28   thickened-section pipe in all sizes of DR 18 at a time when the HDB pass rate was

FOURTH AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 16 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 62 of 140   Page ID
#:14452

1  46% and the Quick Burst pass rate was 60%.  J-M did not maintain any improved
2  processes utilized to make no-thickened-section pipe that passed HDB.

3      187.  To prevent UL from investigating the real source of these four failures
4  (i.e., the various cost-cutting measures and their negative effect on tensile strength),
5  J-M blamed the four failures on illusory problems with the test equipment.
6  Specifically, J-M attributed the failures to the end caps that are inserted into either
7  end of the specimen to create a seal so it can be pressurized.  J-M told Jerry
8  Kirkpatrick, UL's representative observing the tests, that the end caps had not sealed
9  properly, were too old, and were not good for the new pipe design.  All of these
10  statements were false.

11      188.  At no time during the Quick Burst testing did J-M inform UL's Jerry
12  Kirkpatrick that it had prepared the specimens using materials and production rates
13  that are not representative of J-M's manufacturing process or that it had not chosen
14  the specimens at random but had instead selected them based on the fact that they
15  came from lots that had already passed the HDB Test and Sustained Pressure
16  Testing.  Nor did J-M inform UL that it passed the fifth test only by using the
17  original thickened-section pipe design (and an improperly calculated test pressure)
18  as opposed to the new design.  J-M also concealed from UL the real reason for the
19  four tensile-strength failures, i.e., that J-M's cost-cutting measures had decreased the
20  tensile strength of its pipe.

21      **4.  J-M Authorizes Production of No-Thickened-Section Pipe**

22      189.  In early 2005, shortly after he began raising concerns with J-M
23  management about the excessive swelling and failing HDB test results of the no-
24  thickened-section pipe and expressed doubts about the tensile strength of J-M's
25  existing PVC pipe (which was made with the same process and compound), Relator
26  was removed from the No Thickened Section Project.  Over the intervening year
27  before the Project was completed, Fassler and Yang continued to keep Relator
28  apprised of the status of the Project, including the results of all of the testing

FOURTH AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 17 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 63 of 140   Page ID
#:14453

1   performed after Relator was removed.

2       190.   In the Spring of 2005, upon learning that J-M managers were about to
3   recommend that J-M start to produce the no-thickened-section pipe in spite of all the
4   failing results, Relator raised a series of objections to J-M management.   Among
5   other things, Relator cautioned several J-M managers that, at a minimum, the newly
6   designed pipe should be produced only at the two plants that produced the passing
7   results for UL and those two plants should use the same slow production rates and
8   higher quality materials that they had used to specially produce the passing samples.
9   Relator also insisted that, once it was produced and before it shipped, the new pipe
10  must be subjected to a series of quality control tests to ensure its conformance to the
11  tensile strength requirements.   Given the force and strength of Relator's objections,
12  some of Relator's managers ultimately were persuaded to include Relator's
13  precautions in their recommendations for the production of the new no-thickened-
14  section pipe.

15      191.   On April 29, 2005, Fassler prepared an IRA recommending that J-M
16  begin preparations to produce the no-thickened-section pipe starting on May 16.
17  See Exhibit 20.   By April 29, UL had given J-M oral approval to start producing on
18  May 16 the no-thickened-section pipe in all sizes of Blue Brute DR 14 and DR 18,
19  except for 12" DR 14.   Because J-M had received so many failing test results in the
20  process of obtaining the UL listing, Fassler was careful to point out that the no-
21  thickened-section pipe passed the tests only because of "suitable materials and
22  workmanship" and implied that those same materials and level of workmanship
23  should be used as J-M began to produce the newly designed pipe.

24      192.   Lin and Kaushal Rao ("Rao"), J-M's Director and Assistant Director of
25  Production, were equally cautious in their approvals of the new pipe.   Both men
26  gave their approval on the condition that J-M take certain precautions to protect
27  against the tensile strength failures that the UL qualification testing had revealed.   In
28  the block provided on the IRA for his authorization and signature, Lin wrote: "In

FOURTH AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 18 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 64 of 140   Page ID
#:14454

consideration of several test failures to non-thick-section project do propose to have PWI [J-M's Wilton, Iowa plant] & PFO [J-M's Fontana, California plant] to produce non-thick-section product first. After both plants successfully produce C-900 product, then do will apply to all plants." Exhibit 20. Similarly, in his signature/authorization block, Rao wrote: "R&D should also concentrate on one plant & test the pipe produced under different conditions such as regrind material used in prod.; various speeds & production rates for production & test the pipe on a continuous basis." Id.

193. On May 16, 2005, ignoring the reservations expressed by the three managers, J-M's President Walter Wang authorized production of no-thickened-section pipe for J-M's Blue Brute PVC pipe in size DR 18 at all of J-M's 11 PVC-producing plants starting June 1, 2005. See Exhibit 20. Despite explicit advice from Fassler, Lin, and Rao, Walter Wang did not limit the production to the two plants that had successfully produced the passing specimens. Nor did he seek to ensure that the pipe would be produced using the same materials and processing that J-M had used in producing the qualifying specimens or make any provision for testing the new pipe to monitor quality as it was being produced. Despite the fact that its new pipe had failed many of the qualifying tensile strength tests, J-M began manufacturing the new pipe without implementing a single safeguard. No-thickened-section pipe manufactured and tested after Luxco-multiwax was phased out failed nine of 19 UL-witnessed Quick Burst Tests. Post-Luxco multiwax experienced at least two HDB failures in seven tests. J-M did not discontinue Luxco multiwax in IPS/ASTM D2241 pipe despite J-M's concerns with its use in the identically produced AWWA pipe.

## 5. UL's Qualification of J-M's No-Thickened-Section Pipe

194. On May 19, 2005, UL issued J-M its formal written "Notice of Authorization to Apply the UL Mark." Exhibit 22, incorporated herein. In this authorization, UL expressly states that its authorization to apply the UL Listing

FOURTH AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 19 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 65 of 140   Page ID
#:14455

1   Mark extends only to those products that are constructed in a manner "identical to

2   the subject models, which were submitted to UL for this investigation." Id. The

3   letter goes on to say: "Products that bear the UL Mark shall be identical to those that

4   were evaluated by UL and found to comply with UL's requirements.  If changes in

5   construction are discovered, appropriate action will be taken for products not in

6   conformance with UL's requirements and continued use of the UL Mark may be

7   withdrawn." Id.

8       195.  J-M began producing its Blue Brute DR 18 pipe on June 1, 2005.

9   Although UL also had authorized J-M to apply the UL Mark to its Blue Brute PVC

10  pipe in all sizes of DR 14 except for 12", J-M decided to wait until it received UL

11  authorization for the remaining size before it commenced production of any DR 14

12  pipe.  In October 2005, UL provided J-M with its authorization for 12" DR 14 pipe

13  and J-M began producing all sizes of no-thickened-section DR 14 pipe immediately

14  thereafter.

15      196.  Having refused to adopt any of the precautions recommended by its

16  managers, J-M began producing the new pipe using the same cost-cutting measures

17  it had employed with its existing pipe.  As the various test results revealed, pipe

18  created using inferior ingredients, accelerated production rates, and improper tooling

19  fails tensile strength testing a substantial percentage of the time.  Had it been aware

20  of the failing test results and J-M's tampering with the testing, UL would not have

21  given the pipe UL listing in the first place.  Similarly, UL would have withdrawn

22  any UL listing had it known that the precautions that had been taken to produce the

23  passing results (slowing production rates and substituting higher quality ingredients)

24  were not being taken with the daily production of the pipe.

25      **C.    J-M's False Representations Regarding UL Listing and UL**

26            **Compliance**

27      197.  Despite its knowledge (beginning at least in 1991) that a substantial

28  percentage of its PVC pipe failed to meet the LTS requirements of UL 1285 and its

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 20 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 66 of 140   Page ID
#:14456

1    knowledge (as of at least June 1, 2005) that its new no-thickened-section pipe had a

2    similar failure rate, J-M continued to represent to its distributors and customers,

3    including the Real Parties, that its PVC pipe met the requirements of UL 1285.  In

4    its catalogs, J-M stated for both its Blue Brute and Big Blue PVC Pipe that it "is

5    Underwriters Laboratories Listed" and has a tensile strength of 7,000 psi.  Exhibit

6    23, incorporated herein.  In one version of its website (dated 9/8/05), J-M stated that

7    all classes of both its Blue Brute and Big Blue pressure pipe "are UL listed for water

8    mains."  Exhibit 24, incorporated herein.  Except for those pipes painted purple for

9    Reclaimed Water or green for Sewer, J-M continued to mark the outside surface of

10   each length of its Blue Brute and Big Blue pipe with the UL Mark.  See Exhibit 25,

11   incorporated herein.

12        198.   J-M also continued to provide certifications to its individual customers

13   that its Blue Brute and Big Blue PVC pipe had been manufactured in accordance

14   with the requirements of UL 1285.   Exhibit 26, incorporated herein, contains

15   examples of certification letters J-M provided its customers regarding Blue Brute's

16   and Big Blue's compliance with the UL Standard and listing.  At all times relevant

17   to this Complaint, the Real Parties, like other government entities and water

18   distribution systems, have required that all pipes for use in underground fire service

19   systems be UL 1285 listed.  Exhibit 27, incorporated herein, contains examples of

20   specifications from various government entities in which UL listing is required for

21   pipe used in fire services.  In addition to requiring UL listing for PVC pipe used in

22   fire services, many of the Real Parties, like other government entities and water

23   distribution systems, also require that all PVC pipe for use in their water distribution

24   mains or water transmission lines shall be approved by UL and marked with the UL

25   logo.   Exhibit 28, incorporated herein, contains examples of specifications from

26   government entities, including some of the Real Parties, for UL listing of PVC pipe

27   used in water mains and transmission lines.  Government entities, including the Real

28   Parties, often require UL listing of J-M PVC pipe by requiring projects to comply

FOURTH AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 21 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 67 of 140   Page ID
#:14457

1    with National Fire Protection Association ("NFPA") Standard 24, excerpts of which

2    are attached hereto and incorporated herein as Exhibit 43, incorporated herein.  For

3    example, the federal Department of Defense global specifications for Fire Protection

4    Engineering for Facilities require that water distribution systems be designed in

5    accordance with "NFPA 24, Installation of Private Fire Service Mains and Their

6    Appurtenances."   Exhibit 44 (Unified Facilities Criteria (UFC):  Fire Protection

7    Engineering For Facilities, Sept. 26, 2006, Section 3-7, "Water Distribution

8    Systems," paragraph 3-7.1, "Distribution Mains"), incorporated herein.  NFPA 24

9    applies to "combined service mains used to carry water for fire service and other

10   uses."  Exhibit 43 (NFPA 24 at § 1.1.2.).  NFPA 24 requires that PVC pipe be

11   "listed" for fire protection service and comply with certain standards, such as

12   AWWA C900.   See Exhibit 43, NFPA 24 at § 3.2.4, § 10.1.1 & Annex A

13   § A.10.1.1.  The requirement to be "listed" in this context means that the pipe must

14   be inspected and tested by UL and FM for fire protection.  See Exhibit 43, NFPA 24

15   at § 3.2.4 & Annex A § A.3.2.4; Exhibit 6, UL 1285 § 10.1 & § 21.1; Exhibit 49,

16   FM 1612 §§ 1.1.1 & 1.1.2, incorporated herein.   Many cities and government

17   entities, including the Real Parties, require NFPA 24 compliance for fire protection

18   service. See, e.g., Exhibits 27 & 52, incorporated herein.  The only means by which

19   J-M can claim compliance with NFPA 24's "fire listing" requirement are through its

20   claims of UL listing and/or FM approval (discussed infra ¶ 369).

21   **VII.   J-M SELLS SUBSTANDARD PVC PIPE THAT IT IMPROPERLY**

22         **CERTIFIES AS MEETING CERTAIN NSF STANDARDS**

23         199.  NSF is a not-for-profit, non-governmental organization engaged in

24   standards development, product certification, education, and risk-management for

25   public health and safety.

26         200.  To obtain certification under an NSF standard, the applicant must

27   manufacture the pipe to be tested according to a defined formulation.  The pipe is

28   then tested according to the particular standard at issue.   If the results are

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 22 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 68 of 140   Page ID
#:14458

satisfactory, NSF authorizes use of that defined formulation to manufacture pipe that can be certified as complying with the particular standard. NSF also maintains a list of entities that have been authorized to designate their products as meeting NSF standards and uses that list to respond to inquiries regarding whether a manufacturer is NSF-compliant.

201. NSF Standard 14 is a performance standard that applies to both pressurized and non-pressurized pipe. NSF Standard 61 is a toxicology standard that applies to potable water pipe. NSF-PW is a designation J-M applied to its pipe that purported to satisfy both NSF Standard 61 for toxicology and NSF Standard 14 for performance.

202. Pursuant to NSF Standard 14, the pipes, couplings, and gaskets are all subject to testing. Specifically, in addition to other strength tests, tested pipe must pass an HDB Test component by achieving the HDB category of 4,000 psi. To achieve the HDB category of 4,000 psi, tested pipe must produce an LTHS of at least 3,830 psi.

203. Once NSF authorizes a manufacturer to designate a product as complying with a particular NSF standard, the manufacturer may designate a commercial product as complying with that standard only if the commercial product is manufactured using the same formulation and the same process that was used to produce the tested samples.

204. Among other types of pipe, J-M manufactured PVC pipe of two different types: C900 and ASTM D2241.

205. J-M certified that its C900 pipe complied with NSF Standard 61.

206. J-M certified that its ASTM D2241 pipe complied with both NSF Standard 61 and NSF Standard 14.

207. Following successful testing of the JM90 compound pipe pursuant to NSF Standard 61, NSF authorized J-M to designate that product, formulated with or without the use of A28 paraffin wax ("A28"), as complying with NSF Standard 61.

FOURTH AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 23 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 69 of 140   Page ID
#:14459

208.   Following successful testing of the JM90 compound pipe pursuant to NSF Standard 14, NSF authorized J-M to designate that product, which was not formulated with A28, as complying with NSF Standard 14.

209.   A28 was not a preapproved substitute ingredient for NSF 14 performance testing.   In order to use A28 in NSF 14 certified products, a manufacturer must undergo testing at NSF to establish qualification.   J-M never submitted ASTM D2241 pipe samples containing A28 to NSF for testing pursuant to NSF Standard 14, so NSF never authorized J-M to certify its ASTM D2241 pipe formulated with A28 as compliant with NSF Standard 14.

210.   J-M nevertheless certified its ASTM D2241 pipe as complying with NSF Standard 14 by stamping the pipe with either an "NSF 14" or an "NSF PW" designation.

211.   On August 4, 2003, an inspection conducted by NSF auditors at J-M's McNary, Oregon Plant ("McNary") uncovered J-M's unauthorized use of A28 in the formulation of certain of its JM90 PVC pipe that was certified to be "NSF 14" compliant.

212.   As a result, NSF ordered J-M not to release approximately four million pounds of production pipe, which had been manufactured using A28 and was being stored at J-M's McNary warehouse (the "NSF Held Pipe").

**A.      J-M Responded to NSF Putting Four Million Pounds of Production Pipe on Hold at McNary by Releasing Non-Compliant Pipe and Cherry-Picking Samples to Secure NSF Certification by Fraudulent Means**

213.   As J-M is aware, PVC pipe specimens provided to NSF for certification testing must be "representative" of the production pipe to be manufactured.   To be "representative," pipe specimens must be: (1) made using the same materials as in the actual pipe production; (2) produced in the same quantities as in the actual pipe production; and (3) formed using the same process as the manufacture of the actual

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 24 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 70 of 140   Page ID
#:14460

pipe production.   Offering pipe to NSF for certification testing that is not representative of the actual pipe production violates both the NSF guidelines generally and NSF Standard 14 specifically.

214.   The purpose of the "representative" requirement is to prevent companies that manufacture PVC pipe, such as J-M, from manipulating the ingredients, formulae, or process when they manufacture specimen pipes for certification testing.  In addition, these companies, including J-M, are also expressly prohibited from cherry-picking pipe specimens for testing by NSF when the companies know such test specimens are not representative of the production pipe they manufacture.

215.   Only pipe that has the same ingredients, the same formula, and has been made using the same manufacturing process as specimen pipe certified by NSF as meeting the NSF Standard 14 requirements may be marked and sold as NSF Standard 14 pipe.

216.   After NSF learned from its audit that A28 was being used as an ingredient in J-M pipe, the NSF auditor selected a 1" ASTM D2241 pipe specimen for testing from J-M's McNary plant.   On information and belief, this 1" pipe specimen was production pipe manufactured at McNary in the normal course of its production operations.

217.   On August 18, 2003, NSF representative Nasrin Kashefi ("Kashefi") emailed Hwang and Yang, noting the sample data for the 1" pipe did "not look good at all."

218.   On August 20, 2003, Kashefi emailed Hwang and Yang, noting the sample data for the 1" pipe "still [did] not look good."

219.   On August 29, 2003, Kashefi emailed Hwang and Yang, noting the sample data produced by the ongoing HDB test indicated that the 1" pipe would not meet the requirements to pass the HDB test.

220.   An email sent on September 15, 2003 from Kashefi to Yang noted that

69

Case 1:11-cv-01691-MSK-MJW  Document 1-2  Filed 06/28/11  USDC Colorado  Page 25 of 52
Case 5:06-cv-00055-GW -PJW  Document 412  Filed 05/24/11  Page 71 of 140  Page ID
#:14461

the results for the 1" pipe were still not favorable.

221. As of September 15, 2003, data provided by NSF to J-M representatives indicated that the 1" pipe had an LTHS of 3,631 psi, and was thus unlikely to reach the requisite LTHS rate of 3,830 psi upon completion of the HDB test.

222. On September 22, 2003, J-M attempted to stop NSF testing of the 1" pipe by advising NSF that there was "foreign material" in the pipe being tested. J-M requested that NSF permit J-M to submit a different sample of 1" pipe for testing. NSF apparently denied this request.

223. On September 23, 2003, NSF issued a report on the 1" representative sample selected by the NSF auditor. The report concluded that the 1" pipe sample had an LTHS of 3,608 psi, and therefore had failed to meet the requirements of NSF Standard 14.

224. As a result of the obvious financial implications of not being able to sell four million pounds of pipe, J-M had a strong incentive to convince NSF that the NSF Held Pipe sitting in its warehouse did in fact meet the NSF Standard 14 requirements, and J-M promptly undertook steps to try to make this happen.

225. Upon learning of the hold implemented by NSF, J-M immediately dispatched Fassler to McNary to conduct an investigation.

226. Fassler reported to senior management of J-M that, among other things, the C900 pipe made with A28, though not subject to NSF Standard 14, was not compliant with manufacturing standards, but it had, nonetheless, been placed in the "shippable" inventory at McNary.

227. Fassler went on to report that he was unable to locate all of the rejected units of pipe made with A28.

228. On information and belief, the rejected pipe that Fassler was unable to locate in the warehouse had been shipped to customers.

229. Fassler reported to senior management that all production pipe – both

70

FOURTH AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 26 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 72 of 140   Page ID
#:14462

C900 and ASTM D2241 varieties – at McNary was failing very basic Sustained Pressure Tests and, further, that production pipe showed defects in the form of pipe burning and non-conforming bell-ends.

230.   Despite Fassler's report setting forth numerous, severe problems in the production of pipe at McNary, on August 6, 2003, Hwang sent an email to Kashefi requesting the release of all C900 production pipe sitting in the McNary warehouse – approximately 1-1.5 million pounds of pipe.  J-M told Kashefi that because C900 pipe was not governed by NSF Standard 14, NSF had no basis to restrict its sale.

231.   Though technically accurate, C900 pipe is still required to achieve the HDB category of 4,000 psi by producing an LTHS of at least 3,830 psi in compliance with NSF Standard 61.  NSF Standard 61, in contrast to NSF Standard 14, does not require additional testing to ensure the HDB category was satisfied despite the introduction of A28 to the pipe formulation.

232.   As a result, on August 7, 2003, with NSF's approval, J-M released 1.5 million pounds of the C900 pipe for sale, despite knowing from Fassler's investigation and J-M's own Quick Burst testing that the C900 pipe did not conform to basic industry standards.

233.   Even after the release of the C900 pipe, there still remained 2.5 million pounds of ASTM D2441 pipe subject to NSF regulation (the "Remaining NSF Held Pipe").

234.   On information and belief, to this day, not one entity that purchased C900 pipe from J-M has been informed by J-M that: (1) Fassler's report found that production pipe produced at McNary was of inferior quality; (2) test results from the 1" pipe selected by NSF failed HDB testing; or (3) J-M attempted to cherry-pick pipe in an attempt to get the Remaining NSF Held Pipe released, as set forth in more detail below.

235.   In addition to the reports J-M received from NSF and Fassler in the beginning of August as set forth in paragraphs 226-229 supra, J-M received

71

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 27 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 73 of 140   Page ID
#:14463

1  additional reports from Fassler in late August that McNary's Quick Burst Test

2  equipment was failing to properly identify pipe with compromised integrity – a

3  point that Hwang acknowledged, stating that test equipment at McNary had needed

4  to be upgraded "for a long time," and that the plant had lacked a meaningful quality

5  control test "for a long time."

6      236.  Despite receiving the aforementioned updates and reports from NSF

7  about the failing test specimen, and despite Fassler's reports and Hwang's

8  acknowledgement of serious problems with the production pipe at McNary, on

9  September 2, 2003, Yang emailed NSF representative Kashefi, copying Hwang, and

10  sought the release of the Remaining NSF Held Pipe, stating that J-M would take

11  "full responsibility" for its release.

12      237.  NSF refused to authorize the release of the Remaining NSF Held Pipe

13  and made clear that J-M would need to pass certification tests on the pipe before

14  NSF would lift its hold.

15      **1.**     **Unable to Convince NSF to Release the Hold Absent Passing Test**

16          **Results, J-M Conspires to Supply NSF with Cherry-Picked**

17          **Samples of the Remaining ASTM D2241 Pipe**

18      238.  Recognizing that NSF would not permit J-M to release the Remaining

19  NSF Held Pipe without passing test results, J-M focused its efforts on attempting to

20  locate pipe that would pass.  In order to do this, J-M senior managers decided that

21  they would pre-test pipe before sending it to NSF for certification testing.  J-M

22  implemented a policy under which only those samples that passed J-M's pre-tests

23  would be sent to NSF for testing.

24      239.  Internal correspondence at J-M dated September 26, 2003 explained

25  that the "fix" was to never send out a sample produced on a change-over day and, in

26  the future, to cherry-pick samples and pre-test them to ensure that they will pass

27  NSF's HDB test.

28      240.  J-M pre-tested the pipe by subjecting samples to the Quick Burst Test –

FOURTH AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 28 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 74 of 140   Page ID
#:14464

a test that can also be used to predict a pipe's ability to pass HDB testing. If a J-M pipe failed to reach a Quick Burst result significantly higher than 6,400 psi, the likelihood that it would fail HDB testing (which required 7,200 psi on Quick Burst for J-M pipe to pass HDB testing) increased dramatically.

241.   J-M engaged in this practice of cherry-picking pipe despite knowing that doing so violated NSF Standard 14. At all times relevant to the Complaint, J-M knew that pipe undergoing certification testing had to be "representative" of production pipe and that J-M was not permitted to pre-test pipe.

242.   In an effort to find pipe that might pass NSF certification testing, in late September 2003, J-M sent Yang, at that time head of Research and Development at J-M, to McNary to identify and test samples of pipe.

243.   During his visit, Yang observed pipe of such poor quality that he could not, and did not, recommend a single pipe specimen for pre-testing.

244.   J-M senior management displayed no concern for the poor quality of the pipe being manufactured at McNary. Instead, they demanded an immediate resolution to "this A28 issue," a resolution that would permit J-M to sell the Remaining NSF Held Pipe and continue to manufacture substandard pipe.

245.   In late September 2003, Yang traveled to McNary to select and monitor Quick Burst testing on J-M 3/4", 1", and 1 1/2" PVC pipe samples prior to sending them to NSF.

246.   On September 25, 2003, internal J-M Quick Burst test results of Yang's hand-selected pipe were produced. Based on these results, J-M sent samples of J-M's 3/4" and 1 1/2" PVC pipe to NSF.

247.   J-M did not send a sample of the 1" PVC pipe to NSF because the Quick Burst Test results indicated a strong likelihood that the sample would not pass NSF testing.

248.   On October 14, 2003, preliminary NSF laboratory results of the HDB testing for both the 3/4" and 1 1/2" PVC pipe samples selected by Yang were

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 29 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 75 of 140   Page ID
#:14465

1   produced.  Both the 3/4" and 1 1/2" PVC pipe showed a likelihood of failing the

2   HDB test, with an initial LTHS of 3,621 psi and 3,784 psi, respectively.

3       249.  Despite these initial October 14, 2003 test results, J-M continued to

4   press NSF to release the Remaining NSF Held Pipe in its warehouse.

5       250.  NSF conveyed to J-M that all sizes of the Remaining NSF Held Pipe

6   had to pass HDB testing, as provided by NSF Standard 14, before the pipe could be

7   released.

8       251.  Ultimately, in an October 20, 2003 email, Kashefi confirmed to Hwang

9   that both the 3/4" and 1 1/2" PVC pipe samples selected by Yang produced failing

10  HDB testing results with an LTHS of 3,672 psi and 3,792 psi, respectively.

11      252.  Following Kashefi's email confirming the final test results for the 3/4"

12  and 1 1/2" PVC pipe samples, Yang wrote an email to Hwang, dated October 21,

13  2003, questioning J-M's pipe quality in general.  He wondered whether the source

14  of the failures was a quality control problem limited to McNary, a "general problem

15  all over J-M," or "a problem with A28 in [J-M's] formulation."

16      253.  Additionally, since the 1 1/2" PVC pipe was close to meeting the HDB

17  threshold of an LTHS of 3,830 psi, J-M sent an additional pre-screened sample of

18  this size pipe to NSF, hoping that it would reach an LTHS of 3,830 psi.

19      254.  While the 1 1/2" pipe sample was being tested by NSF, J-M sent a

20  second sample of the same size pipe from the same lot to Universal Laboratory.

21      255.  J-M pressed NSF to accept an alternative result from Universal

22  Laboratory in the event that the 1 1/2" pipe sample failed at NSF but the sample at

23  Universal Laboratory passed.

24      256.  In an email dated December 21, 2003, Kashefi told Yang that the 1 1/2"

25  pipe would likely pass the HDB Test, indicating that J-M's cherry-picking had

26  finally paid off.

27      257.  Kashefi further stated that the release would apply only to the 1 1/2"

28  pipe.  She explained that the remainder must either be destroyed or J-M must submit

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 30 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 76 of 140   Page ID
#:14466

1    a sample "for each size" for the HDB test.

2        258.    Meanwhile, the 1 1/2" pipe sample sent to Universal Laboratory,
3    despite being from the same lot as the sample sent to NSF, was on track to fail the
4    HDB testing as of January 16, 2004.

5        259.    Once NSF said that the 1 1/2" pipe sample tested was on track to pass
6    HDB testing, Lin confirmed that the anticipated release by NSF for that pipe size
7    applied to all classes of 1 1/2" pipe – not just the class of the passing samples.

8        260.    The ASTM D2241 pipe being subjected to NSF testing came in
9    different classes based on the relative strength of the pipe.  Each class must meet the
10   established HDB testing requirement.

11       261.    J-M's anticipated release of the 1 1/2" pipe applied to all the different
12   classes of that size pipe, even though only one class had been subjected to NSF
13   testing.

14       262.    On March 5, 2004, NSF authorized the release of all 1 1/2" pipe and 4"
15   pipe being held at McNary.

16       263.    Ten days later, on March 15, 2004, Universal Laboratory sent a letter to
17   J-M, noting that the 1 1/2" pipe sample had failed, with a result of 3,436 psi.  J-M
18   did not inform NSF of this failing result from the same lot that was being tested by
19   NSF.

20       **2.    Impatient for the Release of Pipe, J-M Management Continued to**
21       **Cherry-pick Samples for NSF Testing Throughout the Fall and**
22       **Winter of 2003-2004**

23       264.    By December 2003, J-M had sent pipe specimens of 1" pipe, 3/4" pipe,
24   and 1 1/2" pipe from McNary to NSF, all of which had failed NSF testing despite J-
25   M's efforts to cherry-pick samples.  Faced with approximately 2.5 million pounds of
26   pipe in McNary's warehouse, J-M was desperate to find a way to release that pipe
27   for sale, despite knowing from its own testing, and that of NSF, that much of the
28   pipe was substandard and of poor quality.

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 31 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 77 of 140   Page ID
#:14467

265.   On December 13, 2003, Lin emailed Yang and Hwang, pushing them to get NSF to release the Remaining NSF Held Pipe at McNary without regard to the integrity of the pipe subject to the hold.

266.   Between December 27 and December 31, 2003, Yang went to McNary specifically to cherry-pick samples that could be pre-tested in private laboratories to determine whether they would pass NSF certification tests.

267.   J-M concentrated its cherry-picking and pre-testing of samples on those pipe sizes affected most by NSF's hold, in order to gain the release of as much pipe as possible.

268.   In trying to locate suitable samples that might eventually pass NSF testing, Yang determined that most of the PVC pipe that was 4" and larger might not be worth saving "since they [we]re out-of-spec" and/or had "low hoop stress."

269.   As a result, Yang recommended that J-M McNary's 6", 8", and 10" pipe should be scrapped, as should the 4" pipe if that size did not pass pre-testing.

270.   Yang's observations regarding the questionable pipe quality were passed on to Eric Dirks by Hwang. Hwang noted that J-M did not want to take the chance of having another pipe sample that was sent to NSF fail the HDB test.

271.   With J-M's management seeking the immediate release of the Remaining NSF Held Pipe, Fassler again visited McNary from February 9 through February 11, 2004, to observe pipe production and testing.

272.   In his report to senior management, Fassler noted that with regard to the pipe production process, a "few defects ran for several hours, without correction," that "15% of pipe inventory measured had thin walls," and that there was a need to modify extrusion operating conditions to address the wall thickness issue – a problem that applied to several lines of production.

273.   Fassler further reported that Quick Burst testing machines had not been updated to compliance with ASTM D1599-99, another regulatory standard governing JM-90 PVC pipe, despite his express directive several months earlier that

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 32 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 78 of 140   Page ID
#:14468

1  this be done.

2      274.  Concerned only with the bottom-line, on February 12, 2004, J-M's
3  President, Walter Wang, emailed Lin wanting to know why McNary had so much
4  non-shippable pipe.

5      275.  Lin forwarded Walter Wang's email to Hwang and Yang and directed
6  them to develop a timeline for resolving the pipe hold at McNary, expressing no
7  concern for the integrity of the pipe J-M sought to reintroduce to commerce.

8      276.  Four days later, on February 16, 2004, J-M received pre-test results
9  from the pipes that it had selected for pre-testing at McNary.  On this occasion, J-M
10  had tested several size pipes, including 3/4", 1", 3", 4", 6", 8", and 10" pipe.  Of all
11  these pipe samples pre-tested by J-M, only the 4" sample was likely to be in
12  compliance with NSF Standard 14 for HDB strength.

13      277.  That same day, in response to the pre-testing results and concerned
14  about the quality of the pipe at McNary, Hwang recommended that J-M senior
15  management scrap all McNary pipe, with the exception of the 1 1/2" and 4" sizes.

16      278.  Given the internal results of J-M's pre-testing, only the hand-picked
17  sample of 4" PVC pipe was sent to NSF for testing.

18      279.  The pre-tested 4" PVC pipe was able to pass NSF's HDB test.  As a
19  result, NSF released the hold on that size pipe.  As of this time, NSF had authorized
20  the release of only the 1 1/2" and 4" PVC pipe.

21      280.  J-M persisted with cherry-picking and pre-screening other sizes of J-M
22  PVC pipe to try to obtain the release of additional pipe sizes from NSF.

23      281.  For example, in early March 2004, J-M again pre-tested various sizes
24  of J-M pipe at McNary with the hope of identifying samples it could send to NSF
25  for additional testing.  Of all the pipe sizes tested, J-M found that only the 1/2", the
26  1 1/4" and the 2 1/2" pipes passed J-M's internal standard of 7,200 psi for the Quick
27  Burst test.

28      282.  This Quick Bust testing resulted in multiple samples of 3", 6", and 8"

77

FOURTH AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 33 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 79 of 140   Page ID
#:14469

1  pipe failing to meet the internal standards, as well as one sample of size 10" pipe

2  that failed to meet internal standards.

3      283.   Given the results of the pre-testing, in a last-ditch effort to secure the

4  release of the pipe at McNary, in late March 2004, Yang directed plant personnel to

5  send the "best" sizes of 6" and 8" pipe and to send 1/2", 1 1/4", 2 1/2", and 3" pipe

6  to NSF for certification testing.  Yang told also plant personnel to resample the 2"

7  and 10" pipe.

8      284.   In April 2004, NSF reported to J-M that the 3/4" pipe passed the HDB

9  testing.  However, this passing result was accomplished only by excluding certain

10  data points.  Had NSF included all the data points, the pipe would have failed.

11      285.   Also in April 2004, Quick Burst Test results for various samples of 2"

12  pipe from McNary were reported to Yang.  Of those five samples, only one of the 2"

13  pipe samples tested met J-M's Quick Burst Test standard of 7,200 psi.

14      286.   Based on this data, Yang instructed McNary personnel that the one

15  sample that had met the J-M Quick Burst standard should be the one to be sent to

16  NSF for testing.

17      287.   Also in April 2004, J-M performed internal testing on pre-selected 10"

18  PVC pipe.

19      288.   Though the average result for this test was only 6,806 psi, a sample of

20  this pipe was also sent by J-M to NSF for testing.

21      289.   Ultimately, in June 2004, NSF confirmed that the 2" pipe failed to pass

22  the HDB testing requirement with an LTHS of 3,559 psi.  This test result indicates

23  that the pipe would have less than 12% useful life as compared to a pipe that

24  satisfied the NSF standard.

25      290.   Also in June 2004, NSF confirmed that a 3" pipe sample sent by J-M to

26  NSF in March failed with an LTHS of 3,753 psi.

27      291.   On July 30, 2004, J-M's 10" pipe sample failed NSF testing with an

28  LTHS 3,472 psi.  This test result indicates that the pipe would have less than 7%

FOURTH AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 34 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 80 of 140   Page ID
#:14470

useful life as compared to a pipe that satisfied the NSF standard.

292.   On May 27, 2004, NSF informed J-M that the 8" sample provided to NSF by J-M in March of that year had passed the HDB testing.   J-M subsequently released this pipe.

293.   In June 2004, NSF authorized the release of the 6" pipe provided to NSF by J-M in March of that year.

294.   Also in June 2004, NSF confirmed the release of 1 1/4" and 2 1/2" pipe, based on samples that J-M had pre-tested and sent to NSF for subsequent testing in March 2004.

295.   In July 2004, NSF testing results for the 1/2" pipe that had been selected and pre-tested by J-M in March 2004 showed an LTHS of an abysmal 422 psi.

296.   J-M pre-screened another pipe sample of this size and sent another sample in September 2004.   In October 2004, NSF indicated to J-M that this later-provided sample of 1/2" pipe passed NSF testing.

297.   An IRA dated November 18, 2004 suggested scrapping all 10" pipe. There is no indication that this was done.   To the contrary, J-M continued to have a problem with "missing" rejected pipe, suggesting J-M continued to sell pipe that failed to meet NSF standards.

**B.     J-M's Problems at McNary were Well-Documented and Not Isolated**

298.   J-M was on notice of significant pipe production problems at McNary since at least 2000.

299.   Through reports sent to senior J-M management dating back to September 30, 2000, J-M was aware that: (a) there was little to no quality control testing being done at McNary on the initial days of production; (b) there were unstable extrusion conditions in the pipe production process; and (c) there was poor monitoring of the pipe production process overall.

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 35 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 81 of 140   Page ID
#:14471

300.   J-M was also aware as early as September 2000 that pipe classified as "shippable" inventory at McNary was not in fact suitable for sale.

301.   J-M senior management were well aware of specific concerns raised by plant management at McNary that the hiring of inexperienced staff there in order to reduce labor costs was contributing to the poor pipe quality being manufactured at that plant.

302.   J-M's reaction to McNary management's pleas for more experienced workers was to instruct plant management to push the employees harder and/or "write them up."

**C.   J-M's Conduct with Respect to the A28 Issue is Consistent with J-M's Corporate Culture**

303.   Yang has stated that J-M management tactics included attempts to block any investigation of the cause of pipe non-conformity, including withholding test results from company personnel.

304.   Lin and Rao told J-M personnel to ignore all failing test results for pipe in the quality assurance tests.

305.   Yang was told by J-M management, Rao and Lin, to falsify his analysis of claims by customers so as to make it look as though J-M were not at fault.  Lin and Rao would then sign off on his reports, aware that they were falsified.

306.   Employees who brought issues of pipe quality to management's attention were labeled as "trouble-makers."

307.   Yang quit his position at J-M because management would not let him do his job properly and cared only about profit and not whether the pipe that was shipped was NSF-compliant.

308.   J-M had a practice of re-introducing rejected product into the shippable inventory.

**VIII. J-M'S SALE OF SUBSTANDARD PVC PIPE THAT DOES NOT MEET AWWA AND ASTM D2241 REQUIREMENTS**

FOURTH AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 36 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 82 of 140   Page ID
#:14472

309.   AWWA, an organization of which J-M has always been a member, has promulgated standards governing the physical and chemical properties, including required tensile strength, of PVC pressure pipe for water (potable and reclaimed) and forced-sewer transport.   AWWA Standard C900 applies to 4" through 12" diameter PVC pressure pipe for distribution, and AWWA C905 applies to 14" through 48" diameter PVC Pressure Pipe used for transmission and distribution. See Exhibit 12.

310.   Before AWWA standards for modern urban projects came into prominence, the prevailing industry standard governing PVC pressure pipe was ASTM D2241. See Exhibit 45, incorporated herein.   ASTM is one of the largest standards organizations in the world.   ASTM's mission statement includes the development of standards to "promote public health and safety" and to "contribute to the reliability of materials, products, systems and services."   ASTM standards are widely used and incorporated into other industry standards as well as government contracts and specifications.   Many manufacturers, including J-M, represent that their products have been manufactured and tested in conformance with ASTM standards by so indicating on the product itself or in marketing or other labeling materials.   J-M markets and sells its ASTM D2241 pipe both as "IPS" pipe (IPS refers to Iron Pipe Size), and "PIP" pipe (referring to Plastic Irrigation Pipe).   This Complaint refers to IPS pipe (which includes potable water, reclaimed water, and forced-sewer IPS pipe) and PIP pipe collectively as "ASTM D2241 pipe." Although AWWA controls most new urban piping installations, ASTM D2241 pipe continues to be used in substantial amounts, especially in rural applications.

311.   Like AWWA C900, ASTM D2241 sets minimal requirements for the physical and chemical properties of PVC pressure pipe for water transport (potable and reclaimed) and for forced-sewer applications.   For all purposes relevant to this Complaint, ASTM D2241 pipe is made with the same ingredients and processed in the same manner and on the same equipment as AWWA C900/C905 pipe.

FOURTH AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 37 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 83 of 140   Page ID
#:14473

Moreover, the pertinent requirements of ASTM D2241 are substantively the same as the requirements of AWWA C900/C905, as further shown below. Therefore, the various J-M manufacturing practices that resulted in its failure to meet standards requirements apply equally to both AWWA C900/C905 and ASTM D2241 pipe. Relator has knowledge of J-M pipe manufacturing failures both in the field and in the laboratory for ASTM D2241 pipe as well as AWWA pipe.

312. At all times relevant to this Complaint, the Real Parties, like other government entities with water and sewer systems, have required that PVC pressure pipe for use in their systems comply with or exceed the standards described in AWWA Standards C900/C905 or ASTM Standard D2241. See Exhibits 28, 29, & 51, incorporated herein. AWWA and ASTM D2241 Standards are the universal standards applied in the PVC pressure pipe industry. The standards organizations UL and FM (discussed infra) do not cover sewer and reclaimed-water pipe. J-M, therefore, does not mark its forced-sewer or reclaimed water pipe with UL or FM marks, but it does mark such pipe as compliant with AWWA C900, AWWA C905, or ASTM D2241. Compliance with the requirements of AWWA or ASTM D2241 is so consistent and widespread in this country that the requirement of compliance is understood by domestic purchasers and sellers of water works products regardless of whether it is stated expressly.

313. Relator is unaware of any domestic PVC pipe manufacturer or distributor who openly offers to sell PVC pressure pipe in the DRs (dimension ratios) and standard dimension ratios ("SDRs") offered by J-M that does not claim to comply with AWWA Standards C900 or C905 or ASTM Standard D2241. Nor is Relator aware of any domestic water or forced-sewer system that knowingly permits the purchase of PVC pipe that does not comply with the tensile strength requirements of AWWA C900/C905 or ASTM D2241. The Real Parties would never have knowingly purchased PVC pressure pipe for use in their water and sewer systems that did not comply with AWWA or ASTM D2241 standards.

FOURTH AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 38 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 84 of 140   Page ID
#:14474

314.  To be compliant with the standards, PVC pressure pipe must satisfy certain strength and extrusion-quality tests set forth in AWWA C900/C905 and ASTM D2241, including without limitation: (1) Cell Class Testing, (2) HDB Testing, (3) Sustained Pressure Testing, (4) Quick Burst Testing, and (5) Acetone-Immersion Testing.  For all purposes relevant to this Complaint, the requirements of these tests are substantively identical for both AWWA C900/C905 and ASTM D2241.  Broadly described, the purpose of these tests is to ensure PVC pipe will withstand varying pressures over both short and long periods without leaking. These tests are also meant to ensure that J-M's production pipe is representative of the pipe that originally qualified for the standards, as mandated within the requirements of AWWA C900/905 and ASTM D2241.  However, because of its cost-cutting and productivity measures described in section V above, J-M repeatedly failed each of these tensile strength tests beginning in at least 1991.

**A.  Cell Class Testing**

315.  PVC compounds are identified by a numerical classification system in which each number corresponds to a cell in a Table that identifies the particular property and the minimum required value for that property.  AWWA C900/C905 and ASTM D2241 require that the compound from which PVC pipe is made shall equal or exceed "cell class 12454" as defined in ASTM D1784.  Exhibits 12 & 45. In describing the classification system, ASTM D1784 states that the third number in the designation corresponds to the compound's tensile strength requirements.  See Exhibit 30, incorporated herein.  For cell class 12454, the third number of the designation is 4, which translates to a required tensile strength of 7,000 psi.  Id.

316.  In addition to providing the physical properties that each cell class must have, ASTM D1784 also prescribes the method by which the specimens for testing compliance with these requirements shall be prepared.  Until February 1997, ASTM D1784 only provided one way of preparing the specimens and that was by compression molding.  See Exhibit 31, incorporated herein.  To prepare a sample by

83

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 39 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 85 of 140   Page ID
#:14475

compression molding, separate sheets of PVC compound or pipe are pressed together between two metal drums to form a laminate.

317.   However, beginning in February 1997, ASTM D1784 was revised to include two additional specimen preparation methods.  Instead of just compression-molded specimens, ASTM D1784 provided that compliance with the cell classification requirements "shall be determined with compression-molded, extruded, or injection-molded test specimens for . . . tensile strength." Exhibit 32 at Section 10, incorporated herein.

318.   In the Spring of 1997, Doug Boitz ("Boitz"), J-M's former Product Assurance Manager, contacted members of ASTM D20.15, the Committee responsible for amending ASTM D1784, for guidance regarding the proper interpretation of the amendments to Section 10, the section on specimen preparation. Following his consultation with the Committee members, Boitz wrote an internal memorandum to Lin, discussing what he had learned.  See Exhibit 33, incorporated herein.

319.   In this memo, dated May 5, 1997, Boitz states that the Committee's intent for the change is "to create the ability for manufacturers of extruded or injection molded products to have samples of materials for testing that are representative of the products, which they are producing." Exhibit 33.  In other words, the Committee intended that manufacturers of extruded products use an extruded sample for testing, while manufacturers of compression-molded products use a compression-molded test sample. The Committee's reasoning, Boitz said, was "that the processing can greatly affect the properties and quality of the material or compound." Id.  Since J-M produces its PVC pipe by extrusion, Boitz concluded that ASTM D1784 now required J-M to prepare its specimens by extrusion as well "so that the results obtained from finished products are not significantly different than the tested specimens." Id.  At the end of the memo, Boitz recommends to Lin that J-M's Research and Development Department be notified of this issue so that it

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 40 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 86 of 140   Page ID
#:14476

1   can amend J-M's sample preparation methods to include extruded samples. Id.

2      320.   Despite this clear statement from the ASTM Committee Members that
3   J-M, as a manufacturer of extruded pipe, must use extruded specimens for purposes
4   of cell class testing, Relator has information and believes that J-M continued to use
5   compression molding as one of the primary means of sample preparation for its cell
6   class testing from and after February 1997.   The reason for J-M's allegiance to the
7   compression-molded specimens is that its JM90 compound performs better and
8   yields higher tensile strength results under the compression-molding process than
9   can be obtained via extrusion.   With the use of compression-molded samples, J-M
10  was able to artificially boost its tensile strength results and thereby conceal the fact
11  that its actual tensile strengths were below the minimum 7,000 psi required by
12  AWWA C900/C905 and by ASTM D2241.

13     321.   Two third-party certifiers, International Association of Plumbing and
14  Mechanical Officials ("IAPMO") and NSF, require J-M to submit to annual cell
15  class testing, which includes tests to confirm that J-M's PVC pipe meets a minimum
16  tensile strength of 7,000 psi.   By contrast, AWWA and ASTM, which operate on an
17  honor system, do not require manufacturers to submit to testing or audits.   Relying
18  on the good faith of the manufacturers, AWWA and ASTM operate on the
19  assumption that a manufacturer that represents its parts as being compliant will have
20  regularly performed the necessary tests listed in the standards to ensure that its parts
21  comply and will sell only compliant products.

22     322.   In preparing its samples for the annual IAPMO and NSF cell class
23  testing, J-M followed many of the same practices it had used in preparing samples
24  for UL qualification of its no-thickened-section pipe.   That is, J-M followed a
25  manufacturing process that was not representative of the actual conditions under
26  which its PVC pipe is ordinarily made.   J-M had Fassler specially prepare the
27  samples using compression molding, as opposed to extrusion, with an extraordinary
28  degree of care and precision.   As with its UL qualification testing of the no-

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 41 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 87 of 140   Page ID
#:14477

1   thickened-section pipe, J-M prepared multiple specimens from each lot and sent a

2   subset of these samples to outside laboratories to confirm that when IAPMO or NSF

3   tested the other samples they would meet the required minimum tensile strength of

4   7,000 psi.

5        323.   Even with the advantages gained by special preparation and use of

6   compression-molded samples, J-M only barely met the minimum requirement of

7   7,000 psi in the 2005 annual cell class test performed for IAMPO, and J-M failed

8   tensile strength in prior years' annual IAMPO and NSF testing.   Exhibit 34,

9   incorporated herein, is a copy of a test report from CRT Laboratories, Inc.

10  describing cell class testing performed for IAPMO in June 2005 on J-M

11  compression-molded samples.   While the samples were found to meet the minimum

12  cell class requirements of cell class 12464, the tensile strength results of 7,081 psi

13  were only slightly above the minimum requirement of 7,000 psi.   See Exhibit 34.

14       324.   On multiple occasions, including on September 13, 2005, Yang told

15  Relator that, without the benefit of compression molding and special preparation, J-

16  M's PVC pipe compound actually has a maximum tensile strength of approximately

17  6,700 psi.   Yang cited "extrusion conditions" (i.e., J-M's accelerated production rate

18  and improper tooling and maintenance of its extruders) as the reason for J-M's

19  inability to satisfy the tensile strength requirements of cell class 12454.   Exhibit 36

20  (Relator's notes dated 9/13/05), incorporated herein.

21       **B. HDB Testing**

22       325.   As set forth in sections VI.B. (see ¶¶ 152-159), to qualify J-M's new,

23  no-thickened-section pipe for UL listing, UL required J-M to satisfy the HDB

24  requirements specified in Section 4.3.2.2(b) of AWWA C900 and C905.   As

25  described herein at section VI.B.1. (¶¶ 160-174) and section VI.B.4 (¶¶ 189-193), J-

26  M began producing no-thickened-section pipe on June 1, 2005 despite the fact that it

27  had test results showing that the pipe failed the HDB testing required by AWWA

28  C900 and C905 more than 50 percent of the time.   As a result, it is more likely than

86

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 42 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 88 of 140   Page ID
#:14478

1   not purchasers of J-M's no-thickened-section Blue Brute PVC pipe, including the

2   Real Parties, received pipe that fails to comply with the HDB requirements of

3   AWWA C900 and C905.

4       326. As applied to J-M's PVC pressure pipe, AWWA C900/C905 and

5   ASTM D2241 contain the same HDB requirement: that the pipe be manufactured to

6   meet an HDB category of 4,000 psi. <u>See</u> Exhibit 45. J-M's difficulties with

7   satisfying the HDB requirements predate the production of its AWWA C900 no-

8   thickened-section pipe. J-M also had difficulty satisfying the HDB requirements

9   under J-M's original pipe design (<u>i.e.</u>, J-M's thickened-section Blue Brute and Big

10  Blue PVC pipe) and the HDB requirement of its ASTM D2241 pipe. For instance,

11  as discussed in paragraph 151, on November 14, 2003, Fassler cited as one of the

12  impediments to the success of the No Thickened Section Project the fact that J-M

13  had been experiencing failures in the HDB testing on its existing pipe. <u>See</u> Exhibit

14  16. Relator has information and believes that despite these failing test results, J-M

15  did not reject or scrap a PVC pipe for having failed HDB testing.

16      327. In the 1980s, the Plastic Pipe Section of Johns-Manville, the

17  predecessor company to J-M, promulgated a series of product specifications, many

18  of which were more stringent than applicable industry standards and customer

19  specifications. Johns-Manville included assurances of adherence to these company

20  specifications in its express warranty. When it was founded in 1982, J-M continued

21  to maintain the company specifications Johns-Manville had created and included

22  them in its warranty.

23      328. One of these product specifications, J-M Specification No. PL-25 for

24  4" through 12" PVC Plastic Blue Brute pipe, required the pipe to meet a minimum

25  quick burst stress of 7,200 psi, which was significantly higher than AWWA C900's

26  requirement of 6,400 psi. J-M had the same requirement – a minimum quick burst

27  stress of 7,200 psi – for its ASTM D2241 pipe. One of the primary reasons for the

28  more stringent requirement was to ensure that J-M's PVC pipe would meet the

87

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 43 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 89 of 140   Page ID
#:14479

required HDB tensile strength category. In other words, if the PVC pipe withstood a stress of 7,200 psi during the 60-second Quick Burst Test, it would be more likely to pass the required HDB category of 4,000 psi during the subsequent HDB testing. Conversely, if the PVC pipe failed below 7,200 psi during the Quick Burst Test, it would be at risk of failing to meet the HDB category of 4,000 psi. If the pipe failed below 7,000 psi during the Quick Burst Test, it probably would not meet the HDB category of 4,000 psi. As described in paragraphs 152-153 above, because the Quick Burst testing always precedes the HDB testing, the Quick Burst results can provide an early indication of whether the pipe will pass HDB.

329. In a December 11, 2001 email to Hwang, Fassler stated: "Historically, JM90 pipe that fails ASTM D1599 at less than 7200 psi hoop stress is questionable. JM90 pipe that fails ASTM D1599 at less than 7000 psi hoop stress is BAD PIPE."

330. J-M's normal production pipe typically ranges from 6,400 to 6,800 psi.

331. J-M considers anything below 7200 as a "fail." JM-90 pipe falling below a hoop stress of less than 7,200 psi is at higher risk of failing long-term pressure testing.

332. In an April 17, 2002 memorandum to Chen, Fassler stated: "The data on hand at R&D shows that sustained pressure & HDB test failures become likely in pipe giving QB hoop stresses below 7000 psi."

333. Fassler's PowerPoint Presentation on HDB at the November 11, 2004 Quality Assurance Meeting states: "When providing pipe samples to R&D and/or submitting the same to any outside agencies for testing: (c) Prepare specimens from pipe with a short-term burst pressure test result of 7200 psi or higher."

334. In a memorandum to Hwang regarding the "Benefits of Quick-Burst Testing to 7200 psi Hoop Stress" dated January 25, 2002, Fassler stated: "Bad pipe will almost always exceed 6400 psi hoop stress on the quick-burst test." Also, "PVC pipe that fails at less than 7200 psi hoop stress is poorly extruded. All the sustained pressure test failures and all the HDB (Hydrostatic Design Basis) test

FOURTH AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 44 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 90 of 140   Page ID
#:14480

1  failures in recent years involved pipe that gave quick-burst test results of less than
2  7200 psi hoop stress.  For the above reasons, I suggest that a quick-burst hoop stress
3  result of 7200 psi hoop stress be set as the minimum acceptable level for J-M PVC
4  pressure pipe.  The outside agency standard minimums (typically based on 6400 psi
5  hoop stress) can still be used to defend the Company against customer complaints.
6  Deviations can be granted for pipe exceeding 6400 psi hoop stress."

7       335.   However, on November 19, 2004, J-M revised Specification No. PL-25
8  to lower the short-term quick-burst pressure requirement to the 6,400 psi required by
9  AWWA C900 because it could no longer meet the higher J-M pressure requirement
10 of 7,200 psi.  Exhibit 35, incorporated herein, is a red-lined copy of Specification
11 No. PL-25 reflecting the revision to the lower 6,400 psi requirement.  J-M also
12 revised its quick-burst pressure requirement for ASTM D2241 pipe.  J-M made this
13 revision knowing that, by lowering the quick burst pressure requirement, it would no
14 longer be able to meet the HDB test requirements of AWWA C900/C905 and
15 ASTM D2241.  Despite this knowledge, before making this revision, J-M did not
16 perform any testing to determine its effect on HDB.

17 **C. Sustained Pressure Testing**

18      336.   As described herein at section VI.B.2. (¶¶ 175-180), to qualify J-M's
19 new, no-thickened-section pipe for UL listing, UL required J-M to demonstrate the
20 pipe could pass the Sustained Pressure Test specified in Section 18 of UL 1285.  As
21 further described in section VI.B.2. (¶¶ 175-180), J-M was only able to pass this test
22 by resorting to the following fraudulent practices:  (1) preparing its samples using
23 materials and processing conditions that were vastly superior to those J-M actually
24 used in its day-to-day manufacturing of pipe; (2) cherry-picking samples from lots
25 that had produced passing HDB test results to increase the likelihood they would
26 pass in front of UL; and (3) concealing these facts from UL, other standards and
27 certifying organizations, and J-M's distributors and customers.  Despite the fact it
28 had improperly manipulated the test materials and conditions of the Sustained

89

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 45 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 91 of 140   Page ID
#:14481

1  Pressure Tests to mask the underlying tensile strength problems with the pipe, J-M

2  began producing no-thickened-section pipe on June 1, 2005.

3      337.   The Sustained Pressure Test contained in Section 18 of UL 1285 is

4  substantively identical to the Sustained Pressure Test required by sections 4.3.3.1

5  and 5.1.3 of AWWA C900.   See Exhibits 6 & 12.   Accordingly, in addition to

6  violating UL 1285, J-M also violated AWWA C900 when it engaged in the three

7  fraudulent practices described above while performing the Sustained Pressure Test

8  on its new, no-thickened-section pipe.   As a result of these practices, since June 1,

9  2005 (the date J-M began producing no-thickened-section pipe), it is more likely

10  than not purchasers of J-M's no-thickened-section Blue Brute PVC pipe, including

11  the Real Parties, received pipe that (when tested properly with representative

12  samples) fails to comply with the Sustained Pressure Test requirements of AWWA

13  C900.

14      338.   Over a year before it performed the Sustained Pressure Tests described

15  above on its no-thickened-section pipe, J-M had received reports of its existing PVC

16  pipe failing Sustained Pressure Tests performed for NSF.   NSF's and AWWA's

17  C900/C905 Sustained Pressure Test requirement is substantively identical to the

18  Sustained Pressure Test required by sections 6.2 and 8.4 of ASTM D2241.   As

19  discussed in paragraph 151, on November 14, 2003, Fassler cited as one of the

20  impediments to the success of the No Thickened Section Project the fact that

21  "[r]ecently, pipe from some facilities has failed sustained pressure testing at NSF."

22  Exhibit 16.   Relator has information and believes that despite these failing test

23  results, J-M has never rejected or scrapped a PVC pipe for having failed Sustained

24  Pressure Testing.

25  **D. Quick Burst Testing**

26      339.   As described herein at section VI.B.3. (¶¶ 181-188), to qualify J-M's

27  new, no-thickened-section pipe for UL listing, UL required J-M to demonstrate the

28  pipe could pass the Quick Burst Test specified in Section 4.3.3.2 of AWWA C900,

FOURTH AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 46 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 92 of 140   Page ID
#:14482

which is substantively the same as Section 8.5 of ASTM D2241.  As further described in section VI.B.3. (¶¶181-188), J-M failed several of the Quick Burst Tests and ultimately was only able to pass this test by resorting to the following fraudulent practices:   (1) preparing its samples using materials and processing conditions that were vastly superior to those J-M actually used in its day-to-day manufacturing of pipe; (2) cherry-picking samples from lots that had produced passing HDB and Sustained Pressure Test results to increase the likelihood they would pass in front of UL; and (3) concealing these facts from UL, other standards and certifying organizations, and J-M's distributors and customers.  Despite the fact it had improperly manipulated the test materials and conditions of the Quick Burst Test to mask the underlying tensile-strength problems with the pipe, J-M began producing no-thickened-section pipe on June 1, 2005.  As a result, it is more likely than not purchasers of J-M's no-thickened-section Blue Brute PVC pipe, including the Real Parties, have received pipe that fails to comply with the Quick Burst requirements of AWWA C900.

340.  Well over a year before it performed the Quick Burst Tests described above on its no-thickened-section pipe, J-M had knowledge that its existing PVC pipe was failing the Quick Burst Tests performed daily for purposes of AWWA C900 and ASTM D2241 at each of its 11 PVC pipe plants.  By at least early 2004, Relator, Yang, and Fassler began to receive word from the Quality Control Supervisors at J-M's 11 Plants producing PVC pipe that their respective Plant Managers were overriding reject tags and sending out PVC pipe that the Quality Control Supervisors had rejected for failing the daily Quick Burst Tests.  Relator personally had received three such complaints from Michael Henderson (the Quality Control Supervisor at the Butner, North Carolina Plant), Armondo Martinez (the Quality Control Supervisor at the Fontana, California Plant), and Joe Soliz (the Quality Control Supervisor at the Wharton, Texas Plant).

341.  To try and address this and other burgeoning quality-control problems,

91

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 47 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 93 of 140   Page ID
#:14483

1  Yang, at that time J-M's newly appointed Corporate Quality Control Supervisor,

2  called a meeting of all of the Quality Control Supervisors from each of J-M's 11

3  PVC-pipe Plants.  In addition to Yang and the 11 Quality Control Supervisors, the

4  other attendees were Relator, Rao, Fassler, and Beryl Nadia and Lenor Chang, both

5  of whom worked for Fassler.  At this meeting, which was held at J-M's Pueblo,

6  Colorado Plant in the Spring of 2004, the Quality Control Supervisors told stories of

7  having rejected PVC pipe for failing daily Quick Burst Tests and then being

8  instructed by their respective Plant Managers to continue to test the pipe until they

9  got a passing result.  Since a pipe's tensile strength and other properties gradually

10 increase or stabilize as it is allowed to cool and harden, it often took the Quality

11 Control Supervisors several days and repeated testing to achieve a passing result.

12 However, such repeated testing of individual samples is expressly prohibited by

13 Section 5.1.3 of AWWA C900, which provides that specimens are to be tested "at

14 the beginning of production of each specific material and each size" and thereafter

15 every 24 hours.  Exhibit 12.  ASTM D2241 permits certain retesting only by

16 agreement between the purchaser and seller of the pipe.  Exhibit 45 at Section 9.1.

17     342.  Once a passing result was obtained, the Quality Control Supervisors

18 said the Plant Managers would instruct them to release and ship the pipe despite the

19 fact that it may have failed four out of five Quick Burst Tests.  J-M Plant Managers,

20 whose bonuses are based on the amount of pipe the plant produces, were loath to

21 reject pipe since rejected pipe cannot be included in the plant's production figures

22 and thereby had the effect of taking money out of their pockets.

23     343.  At the Pueblo meeting, Yang and Frank Padilla ("Padilla"), Quality

24 Control Supervisor at the Pueblo, Colorado Plant, provided the Quality Control

25 Supervisors with a review of the proper test methods to be followed when

26 performing the daily Quick Burst Test contained in standards AWWA C900 and

27 ASTM D2241.  (The standards, in turn, state that the testing must be performed in

28 accordance with ASTM D1599.)   This presentation focused on the method

92

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 48 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 94 of 140   Page ID
#:14484

1   prescribed in ASTM D1599 for determining the amount of test pressure to apply to

2   the pipe sample in order to achieve the required 6,400 psi of quick-burst stress in the

3   pipe wall (hereafter "Calculated Test Pressure"). To determine the Calculated Test

4   Pressure, Yang emphasized that ASTM D1599 required the Quality Control

5   Supervisors to measure the minimum wall thickness of the actual pipe sample. See

6   Exhibit 37, incorporated herein.

7          344.   After setting forth these requirements, Yang quickly learned that except

8   for Padilla, the Quality Control Supervisors at the remaining 10 Plants were all

9   doing the calculation wrong. Instead of measuring the wall thickness of the actual

10  pipe sample, the Quality Control Supervisors at the other 10 plants were simply

11  relying on the minimum wall thicknesses listed in Table 1 of AWWA C900 and

12  Table 2 of ASTM D2241 (collectively, "the Tables") for a generic pipe of the same

13  size and pressure class as the sample. However, the wall of the pipe J-M produces

14  invariably is thicker than that of a generic pipe listed in the Tables. Therefore, by

15  relying on the measurement supplied in the Tables instead of actually measuring the

16  wall thickness of the pipe sample, the Quality Control Supervisors of the 10 plants

17  were subjecting the samples to a smaller Calculated Test Pressure than what is

18  required by ASTM D1599.

19         345.   When Yang informed the Quality Control Supervisors that they could

20  no longer rely on the minimum wall thicknesses supplied in the Tables and had to

21  measure the actual pipe samples being tested, they strenuously objected. The

22  Quality Control Supervisors admitted they had enough trouble achieving the

23  required 6,400 psi of stress in the pipe wall even with the benefit gained from the

24  smaller Calculated Test Pressure. If they performed the tests correctly (i.e.,

25  measured the minimum wall thickness of the actual pipe samples), the Quality

26  Control Supervisors complained, they would stand little to no chance of achieving

27  6,400 psi and passing the Quick Burst Tests. As the comments of the Quality

28  Control Supervisors make clear, J-M routinely caused PVC pipe to be shipped to its

FOURTH AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 49 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 95 of 140   Page ID
#:14485

1  customers, including the Real Parties, that failed to meet the requirements of the

2  Quick Burst testing specified in AWWA C900 and ASTM D2241.

3      346. Following this meeting, Yang sought to change the management

4  structure to have the Quality Control Supervisors report to the Corporate Quality

5  Control Supervisor instead of their respective Plant Managers. By so doing, Yang

6  hoped to make it less likely that the Plant Managers would be able to override

7  decisions by the Quality Control Supervisors to reject non-conforming pipe. Yang's

8  request was denied. Despite the considerable problems raised by the Quality

9  Control Supervisors at the Pueblo meeting regarding the short-term tensile strength

10  of its PVC pipe, J-M did not take any steps to address the root cause of the problem

11  and curb the cost-cutting measures described herein at section V. Yang left J-M in

12  October 2005 out of frustration for repeatedly being stymied in his efforts to

13  improve the quality of J-M's products.

14      **E. Acetone-Immersion Testing**

15      347. AWWA C900/C905 and ASTM D2241 require manufacturers to

16  subject their PVC pipe to routine acetone-immersion testing as specified in ASTM

17  D2152. Exhibits 12 & 45. Broadly described, Acetone-Immersion Testing

18  measures "extrusion quality," i.e., how well the extruder processed the PVC

19  compound in forming the pipe. Id. ASTM D2152 specifies that it is important to

20  dry the acetone properly and conduct the test in a sealed container because acetone

21  rapidly absorbs moisture from the atmosphere. See Exhibit 38, incorporated herein.

22  If the sample has been processed well, the acetone will not attack it. However, if the

23  sample has been processed poorly, the acetone will cause it to flake. A sample that

24  shows at least 50 percent attack of the inside, outside, or mid-wall surface of the

25  sample or at least 10 percent attack on more than one surface of the sample has

26  failed the test. Id.

27      348. Because it rapidly absorbs moisture from the air, acetone can quickly

28  become diluted if it is left out in an unsealed container and exposed to air. As

94

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 50 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 96 of 140   Page ID
#:14486

acetone is diluted, its ability to attack pipe samples decreases.  ASTM D2152 specifies that the density of the acetone may be no greater than 0.7890 g/mL at 23°C, corresponding to approximately 1% water by mass.  If a particular container of acetone has more than the prescribed amount of water, the test requires that the excess water be removed with a drying agent or that fresh acetone be used.

349.  J-M did not take adequate safeguards to ensure the integrity of the acetone used in its routine Acetone-Immersion Tests.  For instance, J-M regularly stored its acetone in drums with the lids off.  Consequently, the acetone J-M regularly used for its testing contained an excessive percentage of water.  Although J-M easily could have used a drying agent to remove the excess water, the Plant Managers typically did not want to spend the money for such reagents.  Instead, by testing with diluted acetone, J-M was able to obtain passing test results for specimens that would have failed had they been tested using undiluted acetone.

350.  Even with the benefit gained by using diluted acetone, J-M routinely failed its Acetone-Immersion Tests.  At the Pueblo meeting described above, many of the Quality Control Supervisors reported repeated instances of their Plant Managers overriding reject tags and sending out PVC pipe that the Quality Control Supervisors had rejected for failing the routine Acetone-Immersion Tests required by the standards.  Relator has information and believes that despite these failing test results, J-M did not reject or scrap a PVC pipe for having failed Acetone-Immersion Testing.

**F.** **J-M's False Representations Regarding AWWA and ASTM D2241 Compliance**

351.  As the world's leading supplier of PVC pipe, J-M is acutely aware of the importance of AWWA and ASTM D2241 compliance to its customers, including the Real Parties.  In its product catalogs, sales literature, and on its website, J-M repeatedly describes its PVC pipe as meeting AWWA and ASTM D2241 requirements and a LTS of 7,000 psi.  For example, in the section of its

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 51 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 97 of 140   Page ID
#:14487

catalog dedicated to its Blue Brute PVC pipe, J-M references Blue Brute's compliance with AWWA C900 four times.  On the cover page for this section, beside the words Blue Brute, J-M stated "Meets AWWA C900."  Exhibit 23.  The first line of the first page states "J-M's Blue Brute Pipe conforms to the AWWA C900 specification . . ."  Id.  That same page has a box that prominently states "MEETS AWWA C900."  Finally, in a table entitled "Typical Physical and Chemical Properties and Capacities," J-M cited AWWA C900 as the standard governing its Blue Brute PVC Pipe and notes AWWA C900's tensile strength requirement of 7,000 psi.  The section of J-M's catalog relating to its Big Blue PVC pipe follows an identical format to Blue Brute's, except that it references Big Blue's conformance with AWWA C905 as opposed to C900.

352.  Similarly, in its catalogs for PVC IPS Pressure Rated Pipe, J-M references its claimed compliance with ASTM D2241 several times.  On the cover page for this pipe, beside the words "I.P.S. Pressure," J-M states "MEETS ASTM D2241."  Exhibit 46, incorporated herein.  The first line of the first page describing the pipe states "J-M Manufacturing's (J-MM) I.P.S. Pressure PVC Pipe conforms to ASTM D2241."  Id.  In the catalog's Short Form Specification, J-M again states that the "pipe shall meet the requirements of ASTM D2241."  Id.  In a table entitled "Typical Physical and Chemical Properties and Capacities," J-M cites ASTM D2241 as the government standard and notes the tensile strength requirement of 7,000 psi.  Id.  J-M's catalog for Irrigation PIP Pipe makes similar representations, including claimed compliance with ASTM D2241 and the 7,000 psi tensile strength requirement.  Exhibit 47, incorporated herein.

353.  As alleged in detail above, the statements in J-M's catalogs, websites, and sales literature regarding compliance with AWWA and ASTM D2241 standards and the tensile strength requirement of 7,000 psi were patently false.  At no time did J-M ever distribute a catalog or sales or advertising literature that revealed its substandard tensile strength results in over half of the tensile strength tests

Case 1:11-cv-01691-MSK-MJW   Document 1-2   Filed 06/28/11   USDC Colorado   Page 52 of 52
Case 5:06-cv-00055-GW -PJW   Document 412   Filed 05/24/11   Page 98 of 140   Page ID
#:14488

1   performed since 1991.  Nor did J-M otherwise inform its customers, including the

2   Real Parties, of its substandard tensile strength.

3   **IX.   J-M'S SALE OF SUBSTANDARD PVC PIPE BEARING FM MARK**

4       **DESPITE KNOWLEDGE THAT PIPE DOES NOT QUALIFY FOR FM**

5       **LISTING**

6       354.  FM certifies a range of products that meet its approval standards for,

7   inter alia, fire protection and loss prevention.  Once a product is tested and found to

8   conform to FM's requirements, FM issues the "FM APPROVED" mark for the

9   product, signifying that it meets certain performance requirements.  Entities that use

10  FM-approved goods rely on the representation that the products and manufacturing

11  practices conform to the standards and specification-testing required.

12      355.  FM has promulgated a standard governing PVC pipe for use in

13  underground fire service water mains.  Until 1999, the pertinent FM Standard was

14  FM 1610.  Exhibit 48, incorporated herein.  In 1999, FM updated the applicable

15  standard, providing more detail and segregation of the various standards for

16  underground plastic pipe; the updated standard was renumbered FM 1612.  Exhibit

17  49.  Because the pertinent requirements are substantially the same, FM 1610 and

18  FM 1612 will be referred to collectively as "FM 1612."  FM Standard 1612

19  (effective date April 30, 2000 for full compliance), "Approval Standard for

20  Polyvinyl Chloride (PVC) Pipe and Fittings for Underground Fire Protection

21  Service," governs FM approval and listing of PVC pipe for fire service.

22      356.  FM 1612 lists a variety of requirements that must be met for PVC pipe

23  to be FM Approved, including initial qualification testing and ongoing

24  manufacturing testing.  Its requirements are categorized as General Requirements,

25  Performance Requirements, and Operations Requirements.  The standard requires

26  that "[a]ll FM Approval testing is to be conducted on production samples," and "[i]t

27  is the manufacturer's responsibility to submit samples representative of production."

28  Exhibit 49 at Sections 1.2.3 & 2.3; see also Section 3.2.8 ("Testing shall use

FOURTH AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS